# BELKNAP, INC. *v.* HALE ET AL.

No. 81–1966.   Argued January 11, 1983—Decided June 30, 1983

*Larry E. Forrester* argued the cause and filed a brief for petitioner.

*Samuel A. Alito, Jr.,* argued the cause for the National Labor Relations Board as *amicus curiae* urging reversal.

On the brief were *Solicitor General Lee, Robert E. Allen, Norton J. Come,* and *Linda Sher.*

*Cecil Davenport* argued the cause for respondents. With him on the brief was *Hollis Searcy.**

JUSTICE WHITE delivered the opinion of the Court.

The federal labor relations laws recognize both economic strikes and strikes to protest unfair labor practices. Where employees have engaged in an economic strike, the employer may hire permanent replacements whom it need not discharge even if the strikers offer to return to work unconditionally. If the work stoppage is an unfair labor practice strike, the employer must discharge any replacements in order to accommodate returning strikers. In this case we must decide whether the National Labor Relations Act (NLRA or Act) pre-empts a misrepresentation and breach-of-contract action against the employer brought in state court by strike replacements who were displaced by reinstated strikers after having been offered and accepted jobs on a permanent basis and assured they would not be fired to accommodate returning strikers.

I

Petitioner Belknap, Inc., is a corporation engaged in the sale of hardware products and certain building materials. A bargaining unit consisting of all of Belknap's warehouse and maintenance employees selected International Brotherhood of Teamsters Local No. 89 (Union) as their collective-bargaining representative. In 1975, the Union and Belknap entered into an agreement which was to expire on January 31, 1978. The two opened negotiations for a new contract

---

*Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations; and by *Lawrence M. Cohen* and *Stephen A. Bokat* for the Chamber of Commerce of the United States.

shortly before the expiration of the 1975 agreement, but reached an impasse. On February 1, 1978, approximately 400 Belknap employees represented by the Union went out on strike. Belknap then granted a wage increase, effective February 1, for union employees who stayed on the job.

Shortly after the strike began, Belknap placed an advertisement in a local newspaper seeking applicants to "permanently replace striking warehouse and maintenance employees."[1] A large number of people responded to the offer and were hired. After each replacement was hired, Belknap presented to the replacement the following statement for his signature:

"I, the undersigned, acknowledge and agree that I as of this date have been employed by Belknap, Inc. at its

---

[1] The advertisement said:

"PERMANENT EMPLOYEES WANTED

"BELKNAP, INC.

"111 EAST MAIN STREET
LOUISVILLE, KENTUCKY

"OPENINGS AVAILABLE FOR QUALIFIED PERSONS LOOKING FOR EMPLOYMENT TO PERMANENTLY RE- PLACE STRIKING WAREHOUSE AND MAINTENANCE EMPLOYEES.

"EXCELLENT EARNINGS, FRINGE BENEFITS AND WORKING CONDITIONS WITH STEADY YEAR-ROUND EMPLOYMENT.

"MINIMUM STARTING RATE $4.55 PER HOUR. TOP RATE $5.85, DEPENDING ON SKILL, ABILITY AND EXPERI- ENCE. PLUS INCENTIVE EARNINGS OVER HOURLY RATE FOR MOST JOBS.

"APPLY IN PERSON AT THE BELKNAP OFFICE LOCATED AT 111 EAST MAIN STREET BETWEEN 9:00 A.M. AND 2:30 P.M., MONDAY THRU FRIDAY. PARK IN COMPANY LOT AT 1st AND MAIN.

"WE ARE AN EQUAL OPPORTUNITY EMPLOYER"

Louisville, Kentucky, facility as a regular full time permanent replacement to permanently replace _____ in the job classification of _____."

On March 7, the Union filed unfair labor practice charges against petitioner Belknap. The charge was based on the unilateral wage increase granted by Belknap. Belknap countered with charges of its own. On April 4, the company distributed a letter which said, in relevant part:

"TO ALL PERMANENT REPLACEMENT EMPLOYEES

. . . . .

"We recognize that many of you continue to be concerned about your status as an employee. The Company's position on this matter has not changed nor do we expect it to change. You will continue to be permanent replacement employees so long as you conduct yourselves in accordance with the policies and practices that are in effect here at Belknap.

. . . . .

"We continue to meet and negotiate in good faith with the Union. It is our hope and desire that a mutually acceptable agreement can be reached in the near future. However, we have made it clear to the Union that we have no intention of getting rid of the permanent replacement employees just in order to provide jobs for the replaced strikers if and when the Union calls off the strike."

On April 27, the Regional Director issued a complaint against Belknap, asserting that the unilateral increase violated §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the Act.[2] Also on April 27, the company again addressed the strike replacements:

_____

[2] Section 8(a) of the National Labor Relations Act, 61 Stat. 140, as amended and as set forth in 29 U. S. C. § 158(a), provides, in relevant part:

"We want to make it perfectly clear, once again, that there will be no change in your employment status as a result of the charge by the National Labor Relations Board, which has been reported in this week's newspapers.

"We do not believe there is any substance to the charge and we feel confident we can prove in the courts satisfaction that our intent and actions are completely within the law."

A hearing on the unfair labor practice charges was scheduled for July 19. The Regional Director convened a settlement conference shortly before the hearing was to take place. He explained that if a strike settlement could be reached, he would agree to the withdrawal and dismissal of the unfair labor practice charges and complaints against both the company and the Union. During these discussions the parties made various concessions, leaving one major issue unresolved, the recall of the striking workers. The parties finally agreed that the company would, at a minimum, reinstate 35 strikers per week. The settlement agreement was then reduced to writing. Petitioner laid off the replacements, including the 12 respondents, in order to make room for the returning strikers.

Respondents sued Belknap in the Jefferson County, Ky., Circuit Court for misrepresentation and breach of contract. Belknap, they alleged, had proclaimed that it was hiring permanent employees, knowing both that the assertion was false

---

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

. . . . .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

and that respondents would detrimentally rely on it. The alternative claim was that Belknap was liable for breaching its contracts with respondents by firing them as a result of its agreement with the Union. Each respondent asked for $250,000 in compensatory damages, and an equal amount in punitive damages.

Belknap, after unsuccessfully seeking to remove the suit to federal court,[3] moved for summary judgment, on the ground that respondents' causes of action were pre-empted by the NLRA. The trial court agreed and granted summary judgment. The Kentucky Court of Appeals reversed. The court first concluded that pre-emption was inappropriate because Belknap's alleged activities were not unfair labor practices. Belknap's action was not prohibited by 29 U. S. C. § 158(a)(3), which makes unlawful discrimination in personnel decisions for the purpose of encouraging or discouraging membership in a particular union, since plaintiffs did not seek membership in any labor organization.[4] Relying on *Linn* v. *Plant Guard Workers*, 383 U. S. 53 (1966), the court also concluded that the suit was not pre-empted because the contract and misrepresentation claims were of only peripheral concern to the NLRA and were deeply rooted in local law. The Kentucky Supreme Court granted discretionary review, but later vacated its order as having been improvidently entered.

We granted Belknap's petition for certiorari, 457 U. S. 1131 (1982). We affirm.[5]

---

[3] Respondents assert that Belknap's failure to appeal from the remand order bars Belknap from further litigating the pre-emption issue. The inference is that the state court lacks jurisdiction to proceed and that we should dismiss the petition. The remand order, however, is not reviewable. 28 U. S. C. § 1447(d).

[4] The court also noted that the misrepresentation and breach of contract involved nonunion individuals who were not parties to the collective-bargaining agreement between the Union and Belknap.

[5] The judgment of the Kentucky Court of Appeals is final within the meaning of 28 U. S. C. § 1257: it finally disposed of the federal pre-emption issue; a reversal here would terminate the state-court action; and to permit

## II

Our cases have announced two doctrines for determining whether state regulations or causes of action are pre-empted by the NLRA. Under the first, set out in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), state regulations and causes of action are presumptively pre-empted if they concern conduct that is actually or arguably either prohibited or protected by the Act. *Id.,* at 245. The state regulation or cause of action may, however, be sustained if the behavior to be regulated is behavior that is of only peripheral concern to the federal law or touches interests deeply rooted in local feeling and responsibility. *Id.,* at 243–244; *Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S. 180, 200 (1978); *Farmer* v. *Carpenters,* 430 U. S. 290, 296–297 (1977). In such cases, the State's interest in controlling or remedying the effects of the conduct is balanced against both the interference with the National Labor Relations Board's

the proceedings to go forward in the state court without resolving the preemption issue would involve a serious risk of eroding the federal statutory policy of "'requiring the subject matter of respondents' cause to be heard by the . . . Board, not by the state courts.'" *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 483 (1975), quoting *Construction Laborers* v. *Curry,* 371 U. S. 542, 550 (1963). Or as JUSTICE REHNQUIST put it, our jurisdiction in *Curry* rested on the "understandable principle that where the proper forum for trying the issue joined in the state courts depends on the resolution of the federal question raised on appeal, sound judicial administration requires that such a question be decided by this Court, if it is to be decided at all, sooner rather than later in the course of the litigation." *Cox Broadcasting Corp.* v. *Cohn, supra,* at 506 (dissenting opinion). Thus, our grant of the petition for certiorari in this case was not infirm because of the lack of a final judgment; and our jurisdiction to affirm or reverse the Kentucky Court of Appeals on the pre-emption issue, an issue which is not by any means frivolous, is clear. That we affirm rather than reverse, thereby holding that federal policy would not be subverted by the Kentucky proceedings, is not tantamount to a holding that we are without power to render such a judgment; nor does it require us to dismiss this case for want of a final judgment. *Hudson Distributors, Inc.* v. *Eli Lilly & Co.,* 377 U. S. 386, 389, n. 4, 395 (1964); *Abney* v. *United States,* 431 U. S. 651, 662, 665 (1977).

ability to adjudicate controversies committed to it by the Act, *Farmer* v. *Carpenters, supra,* at 297; *Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S., at 200, and the risk that the State will sanction conduct that the Act protects. *Id.,* at 205. The second pre-emption doctrine, set out in *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976), proscribes state regulation and state-law causes of action concerning conduct that Congress intended to be unregulated, *id.,* at 140, conduct that was to remain a part of the self-help remedies left to the combatants in labor disputes, *id.,* at 147–148.

Petitioner argues that the action was pre-empted under both *Garmon* and *Machinists.* The Board and the AFL–CIO, in *amicus* briefs, place major emphasis on *Machinists;* they argue that the Kentucky courts are attempting to impose Kentucky law with respect to areas or subjects that Congress intended to be unregulated. We address first the *Machinists* and then the *Garmon* submissions.

## III

It is asserted that Congress intended the respective conduct of the Union and Belknap during the strike beginning on February 1 "'to be controlled by the free play of economic forces,'" *Machinists* v. *Wisconsin Employment Relations Comm'n, supra,* at 140, quoting *NLRB* v. *Nash-Finch Co.,* 404 U. S. 138, 144 (1971), and that entertaining the action against Belknap was an impermissible attempt by the Kentucky courts to regulate and burden one of the employer's primary weapons during an economic strike, that is, the right to hire permanent replacements. To permit the suit filed in this case to proceed would upset the delicate balance of forces established by the federal law. Subjecting the employer to costly suits for damages under state law for entering into settlements calling for the return of strikers would also conflict with the federal labor policy favoring the settlement of labor disputes. These arguments, it is urged, are valid whether or not a strike is an economic strike.

We are unpersuaded. It is true that the federal law permits, but does not require, the employer to hire replacements during a strike, replacements that it need not discharge in order to reinstate strikers if it hires the replacements on a "permanent" basis within the meaning of the federal labor law. But when an employer attempts to exercise this very privilege by promising the replacements that they will not be discharged to make room for returning strikers, it surely does not follow that the employer's otherwise valid promises of permanent employment are nullified by federal law and its otherwise actionable misrepresentations may not be pursued. See *J. I. Case Co.* v. *NLRB*, 321 U. S. 332 (1944); see *infra* at 505–506, 511–512, n. 13. We find unacceptable the notion that the federal law on the one hand insists on promises of permanent employment if the employer anticipates keeping the replacements in preference to returning strikers, but on the other hand forecloses damages suits for the employer's breach of these very promises. Even more mystifying is the suggestion that the federal law shields the employer from damages suits for misrepresentations that are made during the process of securing permanent replacements and are actionable under state law.

Arguments that entertaining suits by innocent third parties for breach of contract or for misrepresentation will "burden" the employer's right to hire permanent replacements are no more than arguments that "this is war," that "anything goes," and that promises of permanent employment that under federal law the employer is free to keep, if it so chooses, are essentially meaningless. It is one thing to hold that the federal law intended to leave the employer and the union free to use their economic weapons against one another, but is quite another to hold that either the employer or the union is also free to injure innocent third parties without regard to the normal rules of law governing those relationships. We cannot agree with the dissent that Congress intended such a lawless regime.

The argument that entertaining suits like this will interfere with the asserted policy of the federal law favoring settlement of labor disputes fares no better. This is just another way of asserting that the employer need not answer for its repeated assurances of permanent employment or for its otherwise actionable misrepresentations to secure permanent replacements. We do not think that the normal contractual rights and other usual legal interests of the replacements can be so easily disposed of by broad-brush assertions that no legal rights may accrue to them during a strike because the federal law has privileged the "permanent" hiring of replacements and encourages settlement.

In defense of this position, Belknap, supported by the Board in an *amicus* brief, urges that permitting the state suit where employers may, after the beginning of a strike, either be ordered to reinstate strikers or find it advisable to sign agreements providing for reinstatement of strikers, will deter employers from making permanent offers of employment or at the very least force them to condition their offer by stating the circumstances under which replacements must be fired. This would considerably weaken the employer's position during the strike, it is said, because without assuring permanent employment, it would be difficult to secure sufficient replacements to keep the business operating. Indeed, as the Board interprets the law, the employer must reinstate strikers at the conclusion of even a purely economic strike unless it has hired "permanent" replacements, that is, hired in a manner that would "show that the men [and women] who replaced the strikers were regarded by themselves and the [employer] as having received their jobs on a permanent basis." *Georgia Highway Express, Inc.*, 165 N. L. R. B. 514, 516 (1967), aff'd *sub nom. Truck Drivers and Helpers Local No. 728* v. *NLRB*, 131 U. S. App. D. C. 195, 403 F. 2d 921, cert. denied, 393 U. S. 935 (1968).[6]

---

[6] See also *NLRB* v. *Mars Sales & Equipment Co.*, 626 F. 2d 567, 573 (CA7 1980); *NLRB* v. *Murray Products, Inc.*, 584 F. 2d 934, 939 (CA9 1978); *H. & F. Binch Co.* v. *NLRB*, 456 F. 2d 357, 362 (CA2 1972).

We remain unconvinced. If serious detriment will result to the employer from conditioning offers so as to avoid a breach of contract if the employer is forced by Board order to reinstate strikers or if the employer settles on terms requiring such reinstatement, much the same result would follow from Belknap's and the Board's construction of the Act. Their view is that, as a matter of federal law, an employer may terminate replacements, without liability to them, in the event of settlement or Board decision that the strike is an unfair labor practice strike. Any offer of permanent employment to replacements is thus necessarily conditional and nonpermanent. This view of the law would inevitably become widely known and would deter honest employers from making promises that they know they are not legally obligated to keep. Also, many putative replacements would know that the proffered job is, in important respects, nonpermanent and may not accept employment for that reason. It is doubtful, with respect to the employer's ability to hire, that there would be a substantial difference between the effect of the Board's preferred rule and a rule that would subject the employer to damages liability unless it suitably conditions its offers of employment made to replacements.[7]

Belknap counters that conditioning offers in such manner will render replacements nonpermanent employees subject to discharge to make way for strikers at the conclusion or settlement of a purely economic strike, which would not be the case if replacements had been hired on a "permanent" basis as the Board now understands that term. The balance of power would thus be distorted if the employer is forced to condition its offers for its own protection. Under Belknap's submis-

---

[7] The dissent's argument that state causes of action such as this must be pre-empted because they make it more difficult for the employer to hire replacements proves entirely too much. For example, it might be easier for an employer to obtain replacements by misstating the wages or fringe benefits that it would provide. But if the employer did so, surely the employees affected could seek protection in the state courts.

sion, however, which is to some extent supported by the Board, Belknap's promises, although in form assuring permanent employment, would as a matter of law be nonpermanent to the same extent as they would be if expressly conditioned on the eventuality of settlement requiring reinstatement of strikers and on its obligation to reinstate unfair labor practice strikers. As we have said, we cannot believe that Congress determined that the employer must be free to deceive by promising permanent employment knowing that it may choose to reinstate strikers or may be forced to do so by the Board.

An employment contract with a replacement promising permanent employment, subject only to settlement with its employees' union and to a Board unfair labor practice order directing reinstatement of strikers, would not in itself render the replacement a temporary employee subject to displacement by a striker over the employer's objection during or at the end of what is proved to be a purely economic strike. The Board suggests that such a conditional offer "might" render the replacements only temporary hires that the employer would be required to discharge at the conclusion of a purely economic strike. Brief for NLRB as *Amicus Curiae* (NLRB Br.) 17. But the permanent-hiring requirement is designed to protect the strikers, who retain their employee status and are entitled to reinstatement unless they have been permanently replaced. That protection is unnecessary if the employer is ordered to reinstate them because of the commission of unfair labor practices. It is also meaningless if the employer settles with the union and agrees to reinstate strikers. But the protection is of great moment if the employer is not found guilty of unfair practices, does not settle with the union, or settles without a promise to reinstate. In that eventuality, the employer, although it has prevailed in the strike, may refuse reinstatement only if it has hired replacements on a permanent basis. If it has promised to keep the replacements on in such a situation, discharging them to

make way for selected strikers whom it deems more experienced or more efficient would breach its contract with the replacements. Those contracts, it seems to us, create a sufficiently permanent arrangement to permit the prevailing employer to abide by its promises.[8]

---

[8] The refusal to fire permanent replacements because of commitments made to them in the course of an economic strike satisfies the requirement of *NLRB* v. *Fleetwood Trailer Co.*, 389 U. S. 375, 380 (1967), that the employer have a "legitimate and substantial justification" for its refusal to reinstate strikers. That the offer and promise of permanent employment are conditional does not render the hiring any less permanent if the conditions do not come to pass. All hirings are to some extent conditional. As the Board recognizes, NLRB Br., at 16–17, although respondents were hired on a permanent basis, they were subject to discharge in the event of a business slowdown. Had Belknap not settled and no unfair practices been filed, surely it would have been free to retain respondents and obligated to do so by the terms of its promises to them. The result should be the same if Belknap had promised to retain them if it did not settle with the union and if it were not ordered to reinstate strikers.

The dissent and the concurrence make much of conditional offers of employment, asserting that they prevent replacements from being permanent employees. As indicated in the text, however, the Board's position is that even unconditional contracts of permanent employment are as a matter of law defeasible, first, if the strike turns out to be an unfair labor practice strike, and, second, if the employer chooses to settle with the union and reinstate the strikers. If these implied conditions, including those dependent on the volitional act of settlement, do not prevent the replacements from being permanent employees, neither should express conditions which do no more than inform replacements what their legal status is in any event.

The dissent and the concurrence suggest that if offers of permanent employment are not necessary to secure the manpower to keep the business operating, returning strikers must be given preference over replacements who have been hired on a permanent basis. That issue is not posed in this case, but we note that the Board has held to the contrary. In *Hot Shoppes, Inc.*, 146 N. L. R. B. 802, 805 (1964), the Board held as follows:

"We, however, disagree with the Trial Examiner's premise that an employer may replace economic strikers only if it is shown that he acted to preserve efficient operation of his business. The Supreme Court's decision in *Mackay Radio & Telegraph Company*, and the cases thereafter, although referring to an employer's right to continue his business during a

We perceive no substantial impact on the availability of settlement of economic or unfair labor practice strikes if the employer is careful to protect itself against suits like this in the course of contracting with strike replacements.[9]   Its risk

---

strike, state that an employer has a legal right to replace economic strikers at will.   We construe these cases as holding that the motive for such replacements is immaterial, absent evidence of an independent unlawful purpose.   Therefore, we reject the Trial Examiner's conclusion that the plan to replace the economic strikers here was itself improper and that the strike was converted to an unfair labor practice strike on January 4 by Respondent's implementation of such plan."

The Board noted its holding in *Hot Shoppes, Inc.*, in its Twenty-Ninth Annual Report of the National Labor Relations Board 29 (1964), and the holding has not been repudiated by the Board.   See, *e. g.*, *Pennsylvania Glass Sand Corp.*, 172 N. L. R. B. 514, n. 3, 535 (1968).   There are no cases in this Court that require a different conclusion.   Indeed, as indicated above, in *Hot Shoppes, Inc.*, *supra*, the Board read *NLRB* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333 (1938), as holding that the motive for hiring permanent replacements is irrelevant.   *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221 (1963), cited by JUSTICE BLACKMUN, involved an offer of superseniority to replacements.   The opinion was careful to distinguish cases not involving that element.   *Id.*, at 232.

JUSTICE BLACKMUN also suggests that the Board has held that employment conditioned on the employer's settling with the union is not a permanent employment arrangement and that we should defer to the Board.   But the Board's position in this Court is equivocal at best: "[S]uch a conditional offer *might well* render the replacements only temporary hires . . . ." (Emphasis added.)   NLRB Br., at 17.   This case is thus a far cry from *NLRB* v. *Transportation Management, Inc.*, 462 U. S. 393 (1983), where we were reviewing a clear rule of the Board.   Here there is no firm position of the Board that deserves deference.   *Covington Furniture Mfg. Corp.*, 212 N. L. R. B. 214 (1974), enf'd, 514 F. 2d 995 (CA6 1975), is not to the contrary.   There the replacements could be fired at the will of the employer for any reason; the employer would violate no promise made to a replacement if it discharged some of them to make way for returning strikers, even if the employer was not required to do so by the terms of a settlement with the union.   Of course, in the end, JUSTICE BLACKMUN does not defer to, but rejects, the position of the Board that respondents' suit is pre-empted by the NLRA.

[9] If, as we hold, an employer may condition its offer to replacements and hence avoid conflicting obligations to strikers and replacements in the

of liability if it discharges replacements pursuant to a settlement or to a Board order would then be minimal. We fail to understand why in such circumstances the employer would be any less willing to settle the strike than it would be under the regime proposed by Belknap and the Board, which as a matter of law, would permit it to settle without liability for misrepresentation or for breach of contract.

Belknap and its supporters, the Board and the AFL–CIO, offer no substantial case authority for the proposition that the *Machinists* rationale forecloses this suit. Surely *Machinists* did not deal with solemn promises of permanent employment, made to innocent replacements, that the employer was free to make and keep under federal law. *J. I. Case Co.* v. *NLRB*, 321 U. S. 332 (1944), suggests that individual contracts of employment must give way to otherwise valid provisions of the collective-bargaining contract, *id.*, at 336–339, but it was careful to say that the Board "has no power to adjudicate the validity or effect of such contracts except as to their effect on matters within its jurisdiction," *id.*, at 340. There, the cease-and-desist order, as modified, stated that the discontinuance of the individual contracts was "without prejudice to the assertion of any legal rights the employee may have acquired under such contract or to any defenses thereto by the employer." *Id.*, at 342 (emphasis deleted); see n. 13, *infra*.

event of a settlement providing for reinstatement, the employer will very likely do so. Hence, there will be little occasion for replacements to bring suits for breach of contract or misrepresentation. The employer that nevertheless makes unconditional commitments to replacements and wants to discharge them after settlement with the union will be in much the same position as the employer in *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983). There the employer signed a conciliation agreement with the Equal Employment Opportunity Commission that conflicted with its collective-bargaining agreement with the union. We recognized the employer's dilemma, but because it was of the employer's own making we unanimously refused to relieve the employer of either obligation. *Id.*, at 770.

There is still another variant or refinement of the argument that the employer and the Union should be privileged to settle their dispute and provide for striker reinstatement free of burdensome lawsuits such as this. It is said that respondent replacements are employees within the bargaining unit, that the Union is the bargaining representative of petitioner's employees, and the replacements are thus bound by the terms of the settlement negotiated between the employer and "their" representative.[10] The argument is not only that as a matter of federal law the employer cannot be foreclosed from discharging the replacements pursuant to a contract with a bargaining agent, but also that by virtue of the agreement with the Union it is relieved from responding in damages for its knowing breach of contract—that is, that the contracts are not only not specifically enforceable but also may be breached free from liability for damages. We need not address the former issue—the issue of specific performance— since the respondents ask only damages. As to the damages issue, as we have said above, such an argument was rejected in *J. I. Case.*

If federal law forecloses this suit, more specific and persuasive reasons than those based on *Machinists* must be identified to support any such result. Belknap insists that the rationale of the *Garmon* decision, properly construed and applied, furnishes these reasons.

## IV

The complaint issued by the Regional Director alleged that on or about February 1, Belknap unilaterally put into effect a 50¢-per-hour wage increase, that such action constituted un-

---

[10] The AFL–CIO disavows this argument. It suggests that replacements are bound only by those agreements that a union makes, as the exclusive bargaining agent for the struck employer's workers, regarding the terms and conditions of employment for the employer's work force after the termination of the strike. Brief for AFL–CIO as *Amicus Curiae* 12, n. 4.

fair labor practices under §§ 8(a)(1), 8(a)(3), and 8(a)(5), and that the strike was prolonged by these violations. If these allegations could have been sustained, the strike would have been an unfair labor practice strike almost from the very start. From that time forward, Belknap's advertised offers of permanent employment to replacements would arguably have been unfair labor practices since they could be viewed as threats to refuse to reinstate unfair labor practice strikers. See *NLRB* v. *Laredo Coca Cola Bottling Co.*, 613 F. 2d 1338, 1341 (CA5), cert. denied, 449 U. S. 889 (1980).[11] Furthermore, if the strike had been an unfair labor practice strike, Belknap would have been forced to reinstate the strikers rather than keep replacements on the job. *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 278 (1956). Belknap submits that its offers of permanent employment to respondents were therefore arguably unfair labor practices, the adjudication of which were within the exclusive jurisdiction of the Board, and that discharging respondents to make way for strikers was protected activity since it was no more than the federal law required in the event the unfair labor practices were proved.[12]

---

[11] *Monahan Ford Corp.*, 157 N. L. R. B. 1034, 1045 (1966) (telegram asking unfair labor practice strikers to return to work or suffer replacement violative of § 8(a)(1) as a threat to striker's job tenure for engaging in concerted activity).

[12] The dissent makes the same ineffective argument, ineffective because it cannot explain in any convincing way why the breach, if required by federal law, should not be subject to a damages remedy. It is not easy to grasp why the employer who settles a purely economic strike (such as one in which no unfair labor practice charge is filed) and fires permanent replacements to make way for returning strikers could be made to respond in damages; yet the employer who violates the labor laws is for that reason insulated from damages liability when it discharges replacements to whom it has promised permanent employment. The dissent asserts that to subject the unfair labor practice employer to damages suits would cause intolerable confusion, but as we see it there would be no interference with the Board's authority to impose its remedy for violating the federal labor law. Performing that function neither requires nor suggests that the replace-

Respondents do not dispute that it was the Board's exclusive business to determine, one, whether Belknap's unilateral wage increase was an unfair labor practice, which would have converted the strike into an unfair labor practice strike that required the reinstatement of strikers, and, two, whether Belknap also committed unfair labor practices by offering permanent employment to respondents. They submit, however, that under our cases, properly read, their actions for fraud and breach of contract, are not pre-empted. We agree with respondents.

Under *Garmon*, a State may regulate conduct that is of only peripheral concern to the Act or that is so deeply rooted in local law that the courts should not assume that Congress intended to pre-empt the application of state law. In *Linn* v. *Plant Guard Workers*, 383 U. S. 53 (1966), we held that false and malicious statements in the course of a labor dispute were actionable under state law if injurious to reputation, even though such statements were in themselves unfair labor practices adjudicable by the Board. Likewise, in *Farmer* v. *Carpenters*, 430 U. S. 290 (1977), we held that the Act did not pre-empt a state action for intentionally inflicting emotional distress, even though a major part of the cause of ac-

ments must be deprived of their remedy for breach of contract. See *supra*, at 500.

Of course, here there was no adjudication of an unfair practice. The employer settled short of that possible outcome. That action was *not* required by federal law. We do not share the dissent's apparent view that federal labor policy favoring settlement privileges the employer to make and break contracts with innocent third parties at will. Nor do we understand why the threat of liability to discharged replacements, in the event the employer loses the unfair labor practice case and discharges them, would deter the employer from settling with the Board where it thinks the unfair labor practice charge will be sustained. Settling would not increase its potential liability to replacements. It may be that the employer would prefer to settle even a case that it is quite confident it could win, but that is surely no reason to deprive the replacements of their contract. Nor in such a case do the equities favor the strikers over the replacements, who would be entitled to stay unless the employer has violated the federal law.

tion consisted of conduct that was arguably an unfair labor practice. Finally, in *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180 (1978), we held that a state trespass action was permissible and not pre-empted, since the action concerned only the location of the picketing while the arguable unfair labor practice would focus on the object of the picketing. In that case, we emphasized that a critical inquiry in applying the *Garmon* rules, where the conduct at issue in the state litigation is said to be arguably prohibited by the Act and hence within the exclusive jurisdiction of the NLRB, is whether the controversy presented to the state court is identical with that which could be presented to the Board. There the state-court and Board controversies could not fairly be called identical. This is also the case here.

Belknap contends that the misrepresentation suit is pre-empted because it related to the offers and contracts for permanent employment, conduct that was part and parcel of an arguable unfair labor practice. It is true that whether the strike was an unfair labor practice strike and whether the offer to replacements was the kind of offer forbidden during such a dispute were matters for the Board. The focus of these determinations, however, would be on whether the rights of strikers were being infringed. Neither controversy would have anything in common with the question whether Belknap made misrepresentations to replacements that were actionable under state law. The Board would be concerned with the impact on strikers not with whether the employer deceived replacements. As in *Linn* v. *Plant Guard Workers, supra,* "the Board [will] not be ignored since its sanctions alone can adjust the equilibrium disturbed by an unfair labor practice." *Id.,* at 66. The strikers cannot secure reinstatement, or indeed any relief, by suing for misrepresentation in state court. The state courts in no way offer them an alternative forum for obtaining relief that the Board can provide. The same was true in *Sears* and *Farmer.* Hence, it appears to us that maintaining the misrepresentation action would not

interfere with the Board's determination of matters within its jurisdiction and that such an action is of no more than peripheral concern to the Board and the federal law. At the same time, Kentucky surely has a substantial interest in protecting its citizens from misrepresentations that have caused them grievous harm. It is no less true here than it was in *Linn* v. *Plant Guard Workers, supra,* at 63, that "[t]he injury" remedied by the state law "has no relevance to the Board's function" and that "[t]he Board can award no damages, impose no penalty, or give any other relief" to the plaintiffs in this case. The state interests involved in this case clearly outweigh any possible interference with the Board's function that may result from permitting the action for misrepresentation to proceed.

Neither can we accept the assertion that the breach-of-contract claim is pre-empted. The claimed breach is the discharge of respondents to make way for strikers, an action allegedly contrary to promises that were binding under state law. As we have said, respondents do not deny that had the strike been adjudicated an unfair labor practice strike Belknap would have been required to reinstate the strikers, an obligation that the State could not negate.[13] But respond-

---

[13] Kentucky may not mandate specific performance of the contract between Belknap and respondents nor may it enter an injunction requiring the reinstatement of respondents as a remedy for fraud if either action necessitates the firing of a striker entitled to reinstatement. To do so would be to deprive returning strikers of jobs committed to them by the national labor laws. As the Court said in *National Licorice Co.* v. *NLRB,* 309 U. S. 350, 365 (1940):

"The effect of the Board's order, as we construe it, is to preclude the petitioner from taking any benefit of the contracts which were procured through violation of the Act and which are themselves continuing means of violating it, and from carrying out any of the contract provisions, the effect of which would be to infringe the rights guaranteed by the National Labor Relations Act. *It does not forclose the employees from taking any action to secure an adjudication upon the contracts, nor prejudge their rights in the event of such adjudication.* We do not now consider their nature and

ents do assert that such an adjudication has not been made, that Belknap prevented such an adjudication by settling with the Union and voluntarily agreeing to reinstate strikers, and that, in any event, the reinstatement of strikers, even if ordered by the Board, would only prevent the specific performance of Belknap's promises to respondents, not immunize Belknap from responding in damages for its breach of its otherwise enforceable contracts.

For the most part, we agree with respondents. We have already concluded that the federal law does not expressly or impliedly privilege an employer, as part of a settlement with a union, to discharge replacements in breach of its promises of permanent employment. Also, even had there been no settlement and the Board had ordered reinstatement of what it held to be unfair labor practice strikers, the suit for damages for breach of contract could still be maintained without in any way prejudicing the jurisdiction of the Board or the interest of the federal law in insuring the replacement of strikers. The interests of the Board and the NLRA, on the one hand, and the interest of the State in providing a remedy to its citizens for breach of contract, on the other, are "discrete" concerns, cf. *Farmer* v. *Carpenters*, 430 U. S., at 304. We see no basis for holding that permitting the contract cause of action will conflict with the rights of either the strikers or the employer or would frustrate any policy of the federal labor laws.

## V

Because neither the misrepresentation nor the breach-of-contract cause of action is pre-empted under *Garmon* or *Machinists*, the decision of the Kentucky Court of Appeals is

*Affirmed.*

---

extent. It is sufficient to say here that it will not be open to any tribunal to compel the employer to perform the acts, which, even though he has bound himself by contract to do them, would violate the Board's order or be inconsistent with any part of it." (Emphasis added.)

JUSTICE BLACKMUN, concurring in the judgment.

I

Earlier this month, the Court unanimously reaffirmed the principle that the National Labor Relations Board's construction of the National Labor Relations Act (NLRA), if reasonable, is entitled to deference from the courts. *NLRB* v. *Transportation Management, Inc.*, 462 U. S. 393, 402–403 (1983). The Court today, it seems to me, ignores this fundamental premise of federal labor law in order to conform the substance of the NLRA to the contract and tort laws of the Commonwealth of Kentucky. Having done so, the Court not surprisingly concludes that those state laws are not preempted by the refashioned NLRA. I cannot participate in this extraordinary approach to labor law pre-emption.

The Court recognizes that, "as the Board interprets the law, the employer must reinstate strikers at the conclusion of even a purely economic strike unless it has hired 'permanent' replacements, that is, hired in a manner that would 'show that the men [and women] who replaced the strikers were regarded by themselves and the [employer] as having received their jobs on a permanent basis.'" *Ante*, at 501, quoting *Georgia Highway Express, Inc.*, 165 N. L. R. B. 514, 516 (1967), aff'd *sub nom. Truck Drivers and Helpers Local 728* v. *NLRB*, 131 U. S. App. D. C. 195, 403 F. 2d 921, cert. denied, 393 U. S. 935 (1968). See *post*, at 540–541, n. 13 (dissenting opinion). The Court holds today, however, that the employer may refuse to reinstate strikers at the end of an economic strike if the employer has promised its strike replacements "permanent employment, *subject only to settlement with its employees' union* and to a Board unfair labor practice order," *ante*, at 503 (emphasis supplied)—in other words, if the employer has promised that the jobs are permanent unless it later decides they are temporary. Such a promise bears little resemblance to a promise of permanent employment. During settlement negotiations, the union can be

counted on to demand reinstatement for returning strikers as a condition for any settlement; the employer can be counted on to acquiesce, at a price the union certainly will be willing to pay.[1]

In rejecting the Board's longstanding view of the Act, the Court does not pause to determine whether the Board's view is reasonable, or whether it is contrary to the statutory mandate or frustrates Congress' policy objectives. See *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 32 (1981); *NLRB* v. *Brown*, 380 U. S. 278, 291 (1965). Rather, it adopts an approach that itself is at wide variance with the NLRA. Under the Act, an employer may eliminate economic strikers' jobs only by showing "'legitimate and substantial business justifications.'" *NLRB* v. *Fleetwood Trailer Co.*, 389 U. S. 375, 378 (1967), quoting *NLRB* v. *Great Dane Trailers, Inc.*, 388 U. S. 26, 34 (1967). As the Court recognizes, this rule flows from the Act's fundamental premise that economic strikers "retain their employee status and are entitled to reinstatement." *Ante*, at 503; see *post*, at 525–527 (dissenting opinion). The employer may refuse reinstatement if it has promised permanent employment to replacements. But this is true only because such promises are deemed necessary to serve the employer's legitimate and substantial business justification in seeking "to protect and continue his business by supplying places left vacant" by the strikers. *NLRB* v. *Mackay Co.*, 304 U. S. 333, 345 (1938).

---

[1] The Court's suggestion that the employer's conditional promise "is of great moment if the employer is not found guilty of unfair practices, does not settle with the union, or settles without a promise to reinstate," *ante*, at 503, ignores the significant fact that this is the one situation for which a strike replacement would not need reassurances. An employer that refuses to reinstate strikers as a part of a strike settlement, when it could have demanded concessions from the union in exchange, is unlikely to fire the replacements and reinstate strikers unilaterally. The Court's conditional promise does not relate to potential replacements' concerns—that in order to end the strike, the employer will agree with the union to reinstate the strikers at the replacements' expense.

See *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 232 (1963). The Board reasonably has concluded that this purpose is served only by a promise that the job is not subject to cancellation at the employer's option. *Covington Furniture Mfg. Corp.*, 212 N. L. R. B. 214, 220 (1974), enf'd, 514 F. 2d 995 (CA6 1975).[2] It is patently unreasonable to suppose that the promise the Court substitutes—that the replacements are permanent unless the employer decides otherwise— would further the employer's legitimate goal at all. It is in order to allay the potential replacements' fear that the employer will replace them as part of a settlement with the

---

[2] As the Court's own quotation from *Hot Shoppes, Inc.*, 146 N. L. R. B. 802 (1964), demonstrates, *ante*, at 504–505, n. 8, that case is not to the contrary. *Hot Shoppes* merely holds that, in order to retain strike replacements, the employer need not show in a given case that its offers of permanent employment were motivated by the need to continue the operation of its business. As *Mackay Co.* makes clear, the Act gives the employer the right to make such promises because it is presumed that they serve this purpose, 304 U. S., at 345; the specific motive for a particular offer is irrelevant. In *Hot Shoppes*, as in this case, permanent offers were made. 146 N. L. R. B., at 804. *Hot Shoppes* obviously does not stand for the proposition that an employer *not* making an offer of permanent employment in the manner set forth in *Covington Furniture* may retain replacement employees in preference to strikers. Yet that is what the Court holds today.

The Court also quotes incompletely from the Board's brief in this Court in an effort to demonstrate that the Board's position is "equivocal at best," and therefore not entitled to deference. *Ante*, at 505, n. 8. The full quote is as follows, and is very clear:

"An employer *could not escape the dilemma* posed by the threat of a state court fraud action simply by informing prospective replacements of all the contingencies that might affect their tenure. In the first place, if an employer were to extend only such a conditional offer, its ability to hire replacement workers quickly would be diminished and its chief weapon for combatting the employees' strike pressure would consequently be weakened. Furthermore, such a conditional offer might well render the replacements only temporary hires *and would mean that the employer would be obligated to reinstate the strikers even if the strike turned out to be an economic one. . . .*" Brief for NLRB as *Amicus Curiae* 17 (emphasis supplied).

union that the employer must make the promise in the first place.

Indeed, an employer who makes a conditional promise has no legitimate, much less substantial, business justification to refuse to agree with the union to reinstate the strikers. Under the Court's scenario, the employer has managed to operate its business by hiring replacements on the understanding that they may be fired as part of a settlement of the strike. And whether or not state contract and tort remedies are pre-empted by the Act, the employer can agree to reinstate the strikers at the replacements' expense without incurring liability. The Court's convoluted attempt to establish that its conditional promise would serve some legitimate business purpose, see *ante*, at 503–504, and n. 8, fails to come to grips with these simple facts.

The Court's conditional promise achieves only one thing: it permits an employer, during settlement negotiations with the union, to threaten to retain replacement employees in preference to returning strikers despite the fact that the employer has not promised to do so. The naked interest in making such a threat, silently endorsed in the Court's opinion, could not be less legitimate under the NLRA. From the employer's point of view, one benefit of offering strike replacements permanent employment is that strikers become fearful that they will lose their jobs. But it is clear that creating this fear, which discourages union membership and concerted activities, is a deleterious side effect of, rather than a legitimate business justification for, the power to hire permanent strike replacements. See *NLRB* v. *Erie Resistor Corp.*, 373 U. S., at 232. Promises of permanent employment, and subsequent retention of replacements, are permitted only because it is believed that the harm to protected activities is outweighed by the employer's interest in operating its plant during a strike. *Ibid.* Thus, an employer who succeeds in operating the plant without promising permanent employment would have no legitimate basis for not reinstat-

ing economic strikers. In my view, having made only the Court's conditional promise, an employer who threatened during strike negotiations to retain strike replacements in preference to economic strikers would commit an unfair labor practice. See 29 U. S. C. §§ 158(a)(1) and (3); cf. *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 618–620 (1969) (employer may predict adverse consequences of concerted activities flowing from "economic necessities" they engender, but may not make a "threat of reprisal" for engaging in concerted activities); *NLRB* v. *Fleetwood Trailer Co.*, 389 U. S., at 378 (unjustified refusal to reinstate strikers at end of economic strike is unfair labor practice because it discourages excercise of right to strike).

The Board's construction of the Act is reasonable and entitled to a deference that is wholly lacking in the Court's opinion. By brushing aside the Board's interpretation of the Act, and substituting its own novel construction, the Court sidesteps the real question in what is, as the dissent observes, *post*, at 523, "a difficult case." The question presented is whether respondents' state contract and tort actions are pre-empted by the Act, not whether the Act can be manipulated into a posture consistent with such lawsuits. Taking federal law as it is, however, while the question is close, I conclude that neither of respondents' causes of action is pre-empted.[3]

## II

### A

I cannot easily dismiss the basic premises underlying either the Court's opinion or the dissenting opinion. On the one hand, the dissent aptly observes that respondents' state-

---

[3] This Court, and not the Board, reviews state-court lawsuits said to conflict with federal law. Although it is well established that the Board's construction of the substantive scope of the NLRA is due deference, I am unaware of any case in which this Court has deferred to the Board's views on pre-emption. Cf. *ante*, at 505, n. 8.

law claims "go to the core of federal labor policy." *Post*, at 524. One would not expect that Congress would have left anything so basic as the respective rights and duties of strike replacements and employers to the nonuniform regulation of the States. Cf. *New York Tel. Co.* v. *New York State Labor Dept.*, 440 U. S. 519, 549 (1979) (concurring opinion). On the other hand, there is great strength in the bedrock of the Court's position—it is difficult to believe that Congress could have intended to permit employers and unions "to injure innocent third parties without regard to the normal rules of law governing those relationships." *Ante*, at 500.

Any attempt to reconcile these concerns, in my view, must begin with an analysis of the nature of the economic weapon at issue. The heart of the weapon is the power to hire replacements. The promise of permanent employment is simply one means of achieving this end, a means that unquestionably is permitted by the NLRA. The dissent appears to view the self-help weapon as the power to make such promises, and concludes that Congress intended that this power would be largely unregulated. See *post*, at 536–538. The Court appears to take a different view of the nature of the weapon, implying that the weapon properly is seen as the power to contract with replacement employees, not merely to promise permanent jobs, and that the normal state-law accompaniments of contracts were contemplated and accepted by Congress. See *ante*, at 500, 512.

I believe that the Court's view is more consistent with the purposes and qualities of this particular economic weapon. One may agree with the dissent that permitting employers to hire replacement workers "is part of the balance struck by the Act between labor and management," *post*, at 536, without conceding that all means of accomplishing this were meant to be unregulated. As noted above, the very purpose of enabling an employer to offer permanent employment to strike replacements is to permit the employer to keep its business running during a strike. If the promises of perma-

nent employment are unenforceable, "many putative replace-ments would know that the proffered job is, in important respects, nonpermanent and [might] not accept employment for that reason." *Ante*, at 502. The dissent's view that federal law intends those offers to be nonbinding would under-mine the reason for permitting them. If the promises are en-forceable under state law, however, they are credible; this is the only result consistent with the promises' federal purpose.

Moreover, it is difficult to explain the employer's power to prefer permanent strike replacements over returning eco-nomic strikers unless, through the promise of permanent em-ployment, the employer has incurred an obligation to those replacements. The employer makes offers of permanent em-ployment to induce replacement workers to take jobs. But what is the legitimate and substantial business justification for later refusing to reinstate returning strikers if, as a mat-ter of federal law, the employer is entitled to discharge the replacements in derogation of its promises to them? This power to override the economic strikers' statutory entitle-ment to reinstatement must be based on the common-sense notion that, in order to continue to operate the business, the employer was required to obligate itself to third parties in a manner inconsistent with the strikers' right to subsequent reinstatement. Certainly, avoidance of liability for breach of contract is a legitimate business objective. Because federal law apparently does not obligate the employer to fulfill its promises to the replacements, it must be the typical state-law obligation to honor one's commitments that justifies the employer's disregard for the returning strikers' otherwise paramount statutory entitlement.

## B

Because this case does not fit comfortably within labor pre-emption doctrine as heretofore developed by this Court, see *post*, at 523–524, 530, and n. 2 (dissenting opinion), and because I share the Court's doubt that Congress could have intended

to deprive strike replacements of any remedy for obvious
wrongs, the considerations noted above lead me to affirm the
judgment below, despite the complex problems identified in
the dissent. Cf. *New York Tel. Co.* v. *New York State Labor
Dept.*, 440 U. S., at 549 (concurring opinion) (evidence indi-
cated that Congress decided to tolerate interference with
labor law policies caused by unemployment insurance laws).
I am not persuaded by the dissent's argument that the *Ma-
chinists* doctrine bars respondents' causes of action, for I do
not believe that "Congress intended that the conduct in-
volved be unregulated because left 'to be controlled by the
free play of economic forces.'" *Machinists* v. *Wisconsin
Employment Relations Comm'n*, 427 U. S. 132, 140 (1976),
quoting *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138, 144 (1971).
Unlike the self-help weapon at issue in *Machinists*, promising
permanent employment to strike replacements involves of-
fering to obligate oneself to third parties and inducing their
reliance on that offer. In *Machinists*, the union's refusal to
work overtime did not involve the rights and duties of anyone
but the union and the employer.[4]

The dissent's suggestion that a state action for misrep-
resentation would frustrate the policies of the Act by making
employers more hesitant to promise permanent employment,

---

[4] The right to hire replacements during a strike also differs from the self-
help weapon at issue in *Teamsters* v. *Morton*, 377 U. S. 252 (1964), where
Congress had proscribed specific types of secondary boycotts, but not the
type of boycott there at issue. *Id.*, at 258–260. Had Congress "focused
upon," *id.*, at 261, the power to hire strike replacements and made clear,
by omission, that strike replacements were to be left without a remedy for
breach of contract or deliberate misrepresentation, these actions would be
pre-empted. There is no evidence, however, that Congress focused on
this question. Absent congressional attention, the Court must construe
the Act and determine its impact on state law in light of the wider contours
of federal labor policy. In this case, it appears to me that state enforce-
ment of promises of permanent employment through damages awards for
breach of contract and misrepresentation is consistent with the nature of
the federal weapon itself.

*post*, at 536–538, assumes that under the federal scheme the employer is not meant to hesitate. But I believe that the hesitation engendered by potential contract damages and damages for misrepresentation is as consistent with federal law as it is with common sense and decency. The "free play of economic forces" contemplated by *Machinists* is the clash of weapons used by employer and union against one another. The free play of economic forces does not control one party's pursuit of its goals through imposition of harms on persons external to the dispute, because the economic contest creates no incentive for the other party to impose sanctions for such conduct. In the absence of protection for third parties' rights, the free play of economic forces actually is distorted; the economic cost of a weapon is understated.[5]

Much more troubling is the dissent's argument that the state-law action will discourage the settlement of strikes. *Post*, at 532–533. I agree that, where the employer has chosen to promise permanent employment to strike replacements, its potential liability to them would make the employer reluctant to settle by giving the strikers their old jobs. This problem, it seems to me, is inherent in Congress' choice to permit employers to offer permanent employment in order to obtain replacements. The potential dilemma is one the employer must consider at the time it chooses whether to promise permanent employment. If it makes no promises, settlement will not be impeded.[6]

---

[5] In some circumstances, Congress has permitted parties to a labor dispute to impose harm on third parties with impunity. See, *e. g.*, *Teamsters* v. *Morton*, 377 U. S. 252 (1964). But when Congress has granted such permission, it has done so with care. See n. 4, *supra*.

[6] It is noteworthy, in light of the argument that permitting these state actions violates the rule in *Machinists*, that neither the Board nor the AFL–CIO can explain in whose favor such actions tip the collective-bargaining process. See Brief for NLRB as *Amicus Curiae* 18–19; Brief for AFL–CIO as *Amicus Curiae* 4–5. "Permanent" strike replacements will have certain rights, but employers will hesitate to make permanent

Finally, I cannot agree that the doctrine of *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959), pre-empts respondents' contract action. Of course, if the strike is an unfair labor practice strike and the employer has offered permanent employment to the replacements, federal labor law requires the employer to dismiss the replacements in derogation of his promise. As the dissent implicitly concedes, however, see *post*, at 530–531, n. 2, that conduct is "arguably required" does not necessarily mean it is "arguably protected" within the meaning of *Garmon*. Federal law did not require the employer to make the promise or to commit unfair labor practices. Moreover, as discussed above, once the promises are made and relied upon, I believe that federal law presumes they are in some manner enforceable. If federal law recognizes that the employer voluntarily has undertaken an obligation to the replacements, the fact that the employer commits an unfair labor practice making it impossible for it to fulfill that obligation should not shield the employer from compensating the replacement employees. Cf. *W. R. Grace & Co.* v. *Rubber Workers*, 461 U. S. 757 (1983).

### III

I fully recognize that this view may appear to put the employer between Scylla and Charybdis. Neither the Court's approach, nor the dissent's, however, provides the employer with a safer harbor. The Court's concept of a conditional promise will not help the employer attract replacements, and if the employer wishes to make a meaningful promise, the Court's opinion leaves the employer just where my approach

offers; this hesitancy will redound to the benefit of striking unions, but those employers who do make such promises will hesitate to settle with the union on terms involving return of the strikers. And while the fact that the employer's offers of permanent employment are legally meaningful will make them credible, thereby improving the employer's ability to attract replacement workers during an economic strike, it also will make the offers more costly, and therefore less attractive, for the employer.

would. And by draining all legal meaning from the promise of permanence, the dissent's approach leaves employers unable to attract any but the most gullible and unfortunate of potential replacement employees.

Although I cannot believe that Congress has reconciled the conflict between the striker's right to reinstatement and the employer's right to operate its business during a strike by requiring lies and broken promises to strike replacements to go unredressed, Congress certainly is free to prove me wrong. Congress also is free to resolve the great tensions inherent in this complex three-way struggle entirely within the framework of federal law. Certainly, some form of federal regulation of promises of permanent employment is the most desirable solution to the perplexing problem before the Court, because it would provide both consistency within federal labor law itself and uniformity throughout the Nation. At this time, however, it appears to me that the logic of the Act permits respondents' damages actions.

Accordingly, I concur in the judgment of the Court.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE POWELL join, dissenting.

In some respects, this is a difficult case. Pre-emption cases in the labor law area are often difficult because we must decide the questions presented without any clear guidance from Congress. See *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 286, 289 (1971); *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 240–242 (1959); *Garner* v. *Teamsters*, 346 U. S. 485, 488 (1953). We have developed standards to assist us in our task, see *e. g.*, *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132 (1976); *Garmon, supra*, but those standards are by necessity general ones which may not provide as much assistance as we would like in particular cases. This is especially true when the case is an unusual one. We are not confronted here with a suit between an employer and a union, see *e. g.*, *Sears*,

*Roebuck & Co.* v. *Carpenters,* 436 U. S. 180 (1978); *Machinists, supra; Garmon, supra,* or with one between a union and one of its members, see, *e. g., Farmer* v. *Carpenters,* 430 U. S. 290 (1977); *Lockridge, supra; Plumbers* v. *Borden,* 373 U. S. 690 (1963). Such suits are common and have provided the vehicles for developing the standards we have established in this area. Rather, we have here a suit brought by former employees of petitioner who allegedly were hired as permanent replacements for striking union members. Our prior cases, therefore, provide little guidance in this novel area.

Despite the conceded difficulty of this case, I cannot agree with the Court's conclusion that neither respondents' breach-of-contract claim nor their misrepresentation claim is preempted by federal law. See *ante,* at 512. In my view these claims go to the core of federal labor policy. If respondents are allowed to pursue their claims in state court, employers will be subject to potentially conflicting state and federal regulation of their activities; the efficient administration of the National Labor Relations Act will be threatened; and the structure of the economic weapons Congress has provided to parties to a labor dispute will be altered. In short, the purposes and policies of federal law will be frustrated. I, therefore, respectfully dissent.

I

In *NLRB* v. *American Ins. Co.,* 343 U. S. 395 (1952), the Court stated that "[t]he National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers." *Id.,* at 401–402 (footnote omitted). This process of "ordering and adjusting" competing employer and employee interests has been aptly described as "the keystone of the federal scheme to promote industrial peace." *Teamsters* v. *Lucas Flour Co.,* 369 U. S. 95, 104 (1962). An integral part of this process is the use of economic pressure by both employers and unions to achieve bargaining goals. As the Court stated in *NLRB* v. *Insurance Agents,* 361 U. S.

477 (1960): "The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." *Id.*, at 489.

A union's most important economic weapon is the strike. "The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms . . . ." *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175, 181 (1967). A strike is protected activity under §7 of the Act, 29 U. S. C. §157, and the right to strike is expressly recognized in §13, 29 U. S. C. §163. See *NLRB* v. *Fleetwood Trailer Co.*, 389 U. S. 375, 378 (1967); *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 233 (1963); *NLRB* v. *Rice Milling Co.*, 341 U. S. 665, 672–673 (1951). Moreover, §2(3) of the Act, 29 U. S. C. §152(3), "preserves to strikers their unfilled positions and status as employees during the pendency of a strike." *Erie Resistor Corp.*, *supra*, at 233. See also *Fleetwood Trailer Co.*, *supra*, at 378; *NLRB* v. *Mackay Co.*, 304 U. S. 333, 345 (1938). "This . . . solicitude for the right to strike is predicated upon the conclusion that a strike when legitimately employed is an economic weapon which in great measure implements and supports the principles of the collective bargaining system." *Erie Resistor Corp.*, *supra*, at 233–234.

Employers also have lawful economic weapons at their disposal. See *NLRB* v. *Brown*, 380 U. S. 278 (1965); *American Ship Building Co.* v. *NLRB*, 380 U. S. 300 (1965); *NLRB* v. *Truck Drivers*, 353 U. S. 87 (1957). Among these weapons is one of particular relevance to this case: the right to hire replacements for striking employees. See *NLRB* v. *Mackay Co.*, *supra*, at 345–347.

A variety of rules have been developed regarding the use of economic weapons by employers and unions. As noted, if an employee decides to strike he does not lose his status as an employee. If he offers to return to work at the end of an economic strike, the employer must reinstate him. *Fleet-*

*wood Trailer Co.*, *supra*, at 378. A refusal by the employer to reinstate the employee constitutes an unfair labor practice under §§ 8(a)(1) and 8(a)(3), 29 U. S. C. §§ 158(a)(1) and (a)(3), unless the employer can show that his action is supported by "'legitimate and substantial business justifications.'" *Fleetwood Trailer Co.*, *supra*, at 378, quoting *NLRB* v. *Great Dane Trailers, Inc.*, 388 U. S. 26, 34 (1967).

One such justification arises within the context of an economic strike when "the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations." *Fleetwood Trailer Co.*, *supra*, at 379. In *NLRB* v. *Mackay Co.*, *supra*, the Court recognized that an employer may replace striking employees in an effort to carry on his business. 304 U. S., at 345. The employees' right to strike does not deprive the employer of his "right to protect and continue his business by supplying places left vacant by strikers." *Ibid.* If the employer replaces the strikers, "he is not bound to discharge [the replacements] upon the election of [the strikers] to resume their employment. . . ." *Id.*, at 345–346. "[T]he employer's interest [in continuing operations] must be deemed to outweigh the damage to concerted activities caused by permanently replacing strikers. . . ." *Erie Resistor Corp.*, *supra*, at 232. The burden of proving the existence of this justification, however, is on the employer. *Fleetwood Trailer Co.*, *supra*, at 378. In this regard, the employer must prove that the workers hired to replace the strikers have been hired as permanent employees. See, *e. g.*, *NLRB* v. *Mars Sales & Equipment Co.*, 626 F. 2d 567, 572 (CA7 1980); *NLRB* v. *Murray Products, Inc.*, 584 F. 2d 934, 938–939 (CA9 1978). In *Mars Sales & Equipment Co.*, the Court of Appeals stated:

> "The replacements must be permanent at the time of the discharge . . . or the discharge and refusal to reinstate constitute an unfair labor practice. . . . If an employer hires replacements without a commitment or under-

standing that the job is permanent and also discharges the strikers, the interest in protecting economic strikers by an entitlement to reinstatement is not overcome by a substantial business justification. The employer has not had to offer the jobs on a permanent basis as an inducement to continuing his operations. Hence, an economic striker whose job has not been permanently promised to a replacement at the time the striking employee is discharged is entitled to reinstatement." 626 F. 2d, at 572–573.

See also *International Assn. of M. & A. W., Dist. No. 8* v. *J. L. Clark Co.*, 471 F. 2d 694, 696, 698 (CA7 1972). See generally *H. & F. Binch Co. Plant of Native Laces, Inc.* v. *NLRB*, 456 F. 2d 357 (CA2 1972); *C. H. Guenther & Son, Inc.* v. *NLRB*, 427 F. 2d 983 (CA5 1970).

A different set of rules applies if employees have decided to strike in response to employer unfair labor practices. Under these circumstances, "the striking employees do not lose their status and are entitled to reinstatement with back pay, even if replacements for them have been made." *Mastro Plastics Corp.* v. *NLRB*, 350 U. S. 270, 278 (1956) (footnote omitted). "Failure of the Board to enjoin [the employer's] illegal conduct or failure of the Board to sustain the right to strike against that conduct would seriously undermine the primary objectives of the Labor Act." *Ibid.* See *Fleetwood Trailer Co., supra,* at 379, n. 5; *NLRB* v. *Top Mfg. Co., Inc.*, 594 F. 2d 223, 225 (CA9 1979).

These rules are the product of the "delicate task . . . of weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing in the light of the Act and its policy the intended consequences upon employee rights against the business ends to be served by the employer's conduct." *Erie Resistor Corp., supra,* at 229 (footnotes omitted). See also *NLRB* v. *Truck Drivers, supra,* at 96. The questions presented by this case cannot be addressed, or answered

correctly, without due regard for the existence of these rules and the sensitivity of the process that produced them.

## II

Respondents' breach-of-contract claim is based on the allegation that petitioner breached its contracts with them by entering into a settlement agreement with the union that called for the gradual reinstatement of the strikers respondents had replaced. See App. 3a–5a. The strike involved in this case, however, arguably was converted into an unfair labor practice strike almost immediately after it started. See *ante*, at 494–495, 507–508. If the strike was converted into an unfair labor practice strike, the striking employees were entitled to reinstatement irrespective of petitioner's decision to hire permanent replacements. See *NLRB* v. *Johnson Sheet Metal, Inc.*, 442 F. 2d 1056, 1061 (CA10 1971); *Philip Carey Mfg. Co.* v. *NLRB*, 331 F. 2d 720, 728–729 (CA6 1964). See also *Fleetwood Trailer Co.*, 389 U. S., at 379, n. 5; *Mastro Plastics Corp.*, *supra*, at 278; *supra*, at 527. Under these circumstances, federal law would have required petitioner to reinstate the striking employees and to discharge the replacements. In this light, it is clear that petitioner's decision to breach its contracts with respondents was arguably *required* by federal law.

In *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274 (1971), the Court stated that "[t]he constitutional principles of pre-emption, in whatever particular field of law they operate, are designed with a common end in view: to avoid conflicting regulation of conduct by various official bodies which might have some authority over the subject matter." *Id.*, at 285–286. In this regard, "[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern." *Id.*, at 292. In *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959), the Court stated that "[i]n determining the extent to which state regulation must yield to subordinating federal author-

ity, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration." *Id.*, at 241–242. The Court later noted that "[w]hen the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude the States from acting." *Id.*, at 243 (footnote omitted).[1] See also *Vaca* v. *Sipes*, 386 U. S. 171, 178–179 (1967) ("[T]he broad powers conferred by Congress upon the National Labor Relations Board to interpret and to enforce the complex Labor Management Relations Act . . . necessarily imply that potentially conflicting 'rules of law, of remedy, and of administration' cannot be permitted to operate").

---

[1] The Court went on to state, however, that considerations of federalism have "required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act . . . [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to Act." 359 U. S., at 243–244 (footnote omitted).

The Court established the following standard:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes." *Id.*, at 244 (footnote omitted).

See also *id.*, at 245 ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted").

In my view, these basic principles compel a conclusion that respondents' breach-of-contract claim is pre-empted. The potential for conflicting regulation clearly exists in this case. Respondents' breach-of-contract claim seeks to regulate activity that may well have been required by federal law. Petitioner may have to answer in damages for taking such an action. This sort of conflicting regulation is intolerable. As the Court stated in *Motor Coach Employees* v. *Lockridge, supra,* if "the regulatory schemes, state and federal, conflict . . . pre-emption is clearly called for. . . ." 403 U. S., at 292.[2]

---

[2] The "arguably required" activity at issue in this case is not covered explicitly by *Garmon*'s "arguably protected, arguably prohibited" standard. See 359 U. S., at 244–245; n. 1, *supra*. *Garmon* focused on the need to protect the Board's primary jurisdiction in order to avoid, among other things, conflicting interpretations of federal law. See *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 138–139 (1976). But the pre-emption of state-law claims based on activity arguably required by federal law must be seen as implicit in, and as flowing logically from, *Garmon*. If there is a need to protect the primary jurisdiction of the Board to avoid conflicting interpretations of federal law, then certainly there is an even greater need to pre-empt conflicting state regulation of activity that an employer might be required to pursue by the Board. The need to pre-empt conflicting state regulation of arguably required activity follows *a fortiori* from the arguably protected branch of *Garmon*.

I do not share the Court's apparent belief that the character of any given strike can be predicted with anything approaching certainty. See *ante*, at 508–509, n. 12. As the Board points out: "Whether a particular strike is an economic strike or an unfair labor practice strike . . . is often unclear until the strike has ended. Where the character of a strike is contested, as it frequently is, the issue must be resolved in an unfair labor practice proceeding before the Board." Brief for NLRB as *Amicus Curiae* 12. See also *id.*, at 12, n. 5. As noted, *supra*, at 528–529, the relevant concern is with "potential" conflict. See, *e. g., Garmon*, 359 U. S., at 242. In *Garmon*, the Court stated:

"The nature of the judicial process precludes an *ad hoc* inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief

The Court recognizes that "had the strike been adjudicated an unfair labor practice strike, [petitioner] would have been required to reinstate the strikers . . . ." *Ante*, at 511. The Court concedes that the State "could not negate" this obligation, *ibid.*, and states that the contracts at issue here could not be specifically enforced. *Ante*, at 511–512, n. 13. "To do so would be to deprive returning strikers of jobs committed to them by the national labor laws." *Ibid.* In the Court's view, however, "even had there been no settlement and the Board had ordered reinstatement of what it held to be unfair labor practice strikers, the suit for damages for breach of contract could still be maintained without in any way prejudicing the jurisdiction of the Board or the interest of the federal law in insuring the replacement of strikers." *Ante*, at 512.[3]

Prohibiting specific enforcement, but permitting a damages award, does nothing to eliminate the conflict between state and federal law in this context. The Court fails to rec-

---

such a conflict would cause. Nor is it our business to attempt this. Such determinations inevitably depend upon judgments on the impact of these particular conflicts on the entire scheme of federal labor policy and administration. Our task is confined to dealing with classes of situations. To the National Labor Relations Board and to Congress must be left those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration." *Ibid.*

[3] In reaching this conclusion, the Court also appears to rely on language in *National Licorice Co.* v. *NLRB*, 309 U. S. 350 (1940), to the effect that a Board order prohibiting an employer from taking advantage of contracts procured in violation of the National Labor Relations Act did not foreclose employees "from taking any action to secure an adjudication upon the contracts. . . ." *Id.*, at 365. See *ante*, at 511–512, n. 13.

*National Licorice Co.* addressed the validity under federal law of contracts obtained by the employer through negotiations with an employee organization dominated by the employer. See 309 U. S., at 359–361. The case also addressed the scope of the Board's remedial powers. *Id.*, at 361–367. The Court in *National Licorice Co.* did not consider whether suits that might be brought by the employees in state court would be preempted by federal law.

ognize that "regulation can be as effectively exerted through an award of damages as through some form of preventive relief." *Garmon*, 359 U. S., at 247. "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Ibid.* The force of these observations is apparent in this case. If an employer is confronted with potential liability for discharging workers he has hired to replace striking employees, he is likely to be much less willing to enter into a settlement agreement calling for the dismissal of unfair labor practice charges and for the reinstatement of strikers. Instead, he is much more likely to refuse to settle and to litigate the charges at issue while retaining the replacements.[4] Such developments would frustrate the strong federal interest in ending strikes and in settling labor disputes.[5] In addition,

---

[4] I do not share the Court's apparent view, see *ante*, at 508–509, n. 12, that the outcome of all unfair labor practice proceedings can be predicted with any confidence. See, *e. g.*, Brief for NLRB as *Amicus Curiae* 12, n. 5. In any event, the important point is that the threat of potential liability to replacements is likely to deter an employer from settling in any case in which the unfair labor practice charges provide him with the chance to present a strong, or perhaps even a colorable, defense.

[5] In this regard, it is important to keep in mind that strike settlement negotiations are part of the collective-bargaining process. As the Court stated in *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95 (1962), "[s]tate law which frustrates the effort of Congress to stimulate the smooth functioning of [the collective-bargaining] process . . . strikes at the very core of federal labor policy." *Id.*, at 104.

Moreover, it is a legitimate bargaining demand for a union to seek reinstatement of strikers in preference to replacements. See *Portland Stereotypers' Union No. 48*, 137 N. L. R. B. 782, 786 (1962).

We recognized the importance of strike settlement agreements in *Retail Clerks* v. *Lion Dry Goods, Inc.*, 369 U. S. 17 (1962), when we noted that the settlement agreement involved in that case was "an agreement between employers and labor organizations significant to the maintenance of labor peace between them." *Id.*, at 28. The Court went on to state:

"[The agreement] came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the

the National Labor Relations Board has suggested that any impediment to the settlement of unfair labor practice charges would have a serious adverse effect on the Board's administration of the Act. Brief for NLRB as *Amicus Curiae* 13, n. 6.[6] Finally, any obstacle to strike settlement agreements clearly affects adversely the interest of striking employees in returning to work, to say nothing of the public interest in ending labor strife. Consideration of these factors leads to the clear conclusion that respondents' breach-of-contract claim must be pre-empted.[7]

working conditions of the employees of both respondents. It effected the end of picketing and resort by the labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship." *Ibid.*

Strike settlement agreements are enforceable under § 301(a) of the Labor Management Relations Act, 29 U. S. C. § 185(a). As we stated in *Lion Dry Goods,* "[i]f this kind of strike settlement were not enforceable under § 301(a), responsible and stable labor relations would suffer, and the attainment of the labor policy objective of minimizing disruption of interstate commerce would be made more difficult." 369 U. S., at 27.

[6] The Board states: "Over 82% of Board unfair labor practice complaints are resolved through settlement. Since the Board issues nearly 8,000 complaints a year, its regulatory mission would be frustrated by any impediments to settlements." Brief for NLRB as *Amicus Curiae* 13, n. 6.

[7] Even assuming that such analysis is necessary, this claim clearly does not fall within the exceptions to the pre-emption doctrine described in *Garmon.* See n. 1, *supra.* The claim at issue here hardly can be said to relate to activity that is "a merely peripheral concern of the . . . Act." *Garmon,* 359 U. S., at 243. Moreover, the conduct at issue here does not touch "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.,* at 244 (footnote omitted). In this regard, this case is readily distinguishable from cases like *Farmer* v. *Carpenters,* 430 U. S. 290 (1977), and *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966). The breach-of-contract claim is not based on "'intimidation and threats of violence' affect[ing] such compelling state interests as to permit the exercise of state jurisdiction." *Linn,* 383 U. S., at 62. Nor does the claim involve malicious libel, see *ibid.,* or the

534

### III

Respondents' misrepresentation claim stands on a somewhat different footing than their breach-of-contract claim. There is no sense in which it can be said that federal law required petitioner to misrepresent to respondents the terms on which they were hired. Permitting respondents to pursue their misrepresentation claim in state court, therefore, does not present the same potential for directly conflicting regulation of employer activity as permitting respondents to pursue their breach-of-contract claim. Nor can it be said that petitioner's alleged misrepresentation was "arguably protected" under *Garmon*. While it is arguable that petitioner's alleged offers of permanent employment were prohibited by the Act and therefore pre-empted under *Garmon*, see n. 1, *supra*, careful analysis yields the conclusion that this is not a sufficient ground for pre-empting respondents' misrepresentation claim.[8] In my view, however, respondents' misrepresentation claim is pre-empted under the analysis articulated principally in *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132 (1976).

The pre-emption doctrine described in *Machinists* finds its roots in *Garner* v. *Teamsters*, 346 U. S. 485 (1953), and in

---

intentional infliction of emotional distress resulting from conduct "so outrageous that 'no reasonable man in a civilized society should be expected to endure it.'" *Farmer, supra*, at 302.

[8] If this strike was converted into an unfair labor practice strike almost immediately after it started, see *ante*, at 494–495, 507–508; *supra*, at 528, petitioner's offers of permanent employment to replacements may have constituted additional unfair labor practices under § 8(a)(1), 29 U. S. C. § 158(a)(1). See *NLRB* v. *Laredo Coca Cola Bottling Co.*, 613 F. 2d 1338, 1341 (CA5 1980); *ante*, at 508. *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180 (1978), suggests, however, that this is not a sufficient ground for pre-emption under the "arguably prohibited" branch of *Garmon*. Unfair labor practice proceedings before the Board based on this arguably prohibited conduct would not be identical to the state-court action involving respondents' misrepresentation claim. See 436 U. S., at 196–197.

*Teamsters* v. *Morton,* 377 U. S. 252 (1964). During the course of considering a pre-emption question in *Garner,* the Court stated: "For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits." 346 U. S., at 500. In *Morton,* the Court considered whether a state court should be permitted to award damages under state law for injuries caused by union conduct that was assumed to be neither protected nor prohibited by federal law. 377 U. S., at 258. The Court stated that the answer to this question "ultimately depends upon whether the application of state law in this kind of case would operate to frustrate the purpose of the federal legislation." *Ibid.* The Court held that it would. *Id.,* at 260. In reaching this conclusion, the Court reasoned that the self-help weapon at issue "formed an integral part of [the union's] effort to achieve its bargaining goals during negotiations with [the employer]." *Id.,* at 259. Permitting the use of this weapon was "part of the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community." *Ibid.* The Court concluded: "If the [state] law of secondary boycott can be applied to proscribe the same type of conduct which Congress focused upon but did not proscribe . . . , the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy." *Id.,* at 259–260.

*Machinists* relied on *Garner* and *Morton* in expressly articulating a branch of labor law pre-emption analysis distinct from the *Garmon* line of cases. The Court in *Machinists* described this branch as "focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because left 'to be controlled by the free play

of economic forces.'" 427 U. S., at 140 (citation omitted). While earlier cases had addressed this question within the context of union and employee activities, see *id.*, at 147, the Court noted that "self-help is . . . also the prerogative of the employer because he, too, may properly employ economic weapons Congress meant to be unregulable." *Ibid.* The Court stated: "Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" *Id.*, at 147–148 (citation omitted).[9]

As noted, see *supra*, at 525, employers have the right to hire replacements for striking employees. This is an economic weapon that the employer may use to combat pressure brought to bear by the union. Permitting the use of this weapon is part of the balance struck by the Act between labor and management. There is no doubt that respondents' misrepresentation claim, involving as it does the potential for substantial employer liability, burdens an employer's right to resort to this weapon. This is especially apparent when one considers the fact that the character of a strike is often unclear. A strike that starts as an economic strike, during which an employer is entitled to hire permanent replacements that he need not discharge to make way for returning strikers, may be converted into an unfair labor practice strike, in which case the employer loses his right to hire per-

---

[9] See Cox, Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1339 (1972) ("[T]he need for preserving the balance of power established by Congress in labor-management relations against disturbance by the application of state laws or decisions making a different accommodation furnishes compelling reason for federal preemption in the areas predominantly involving employee self-organization, collective bargaining, or the use of economic power to secure organizational or bargaining objectives, regardless of whether the alleged misconduct is 'arguably protected or prohibited' ").

manent replacements subsequent to the date of the conversion. See *NLRB* v. *Top Mfg. Co.*, 594 F. 2d 223, 225 (CA9 1979); *NLRB* v. *Johnson Sheet Metal, Inc.*, 442 F. 2d 1056, 1061 (CA10 1971); *Philip Carey Mfg. Co.* v. *NLRB*, 331 F. 2d 720, 728–729 (CA6 1964). See also *ante*, at 507–508; *supra*, at 527.[10] Moreover, in order to preserve his right to retain the replacements and to refuse to reinstate returning strikers, the employer must establish that the replacements have been hired on a permanent basis in order to continue his business operations. See *supra*, at 526–527. Only under these circumstances can the strikers' right to reinstatement be overcome, and the consequent burden on the right to strike be justified.[11]

In order to avoid misrepresentation claims, an employer might decide not to hire replacements on a permanent basis or to hire permanent replacements only in cases in which it is absolutely clear that the strike is an economic one. Either of these developments would mean that employers were being inhibited by state law from making full use of an economic weapon available to them under federal law. Moreover, if an employer decided not to hire replacements on a permanent basis, his ability to hire replacements might be affected adversely. An employer also might decide to disclose to prospective replacements the possibility, even if it is remote, that the strike might be determined to have been an unfair labor practice strike and that he might be ordered to reinstate the strikers and to discharge the replacements. This course of action, however, might limit an employer's ability to hire replacements, and it might have the further effect of

---

[10] As noted, *supra*, at 528, the strike in this case arguably was converted into an unfair labor practice strike almost immediately after it started. See *ante*, at 494–495, 507–508.

[11] More than likely, it was the need to carry this burden that caused petitioner to have respondents sign the statements involved in this case. See *ante*, at 494–495.

rendering the replacements temporary under federal law, in which case the strikers would be entitled to reinstatement regardless of the nature of the strike. See *supra,* at 526–527.

Based on this analysis, it is clear that permitting respondents to pursue their misrepresentation claim in state court would limit and substantially burden an employer's resort to an economic weapon available to him under federal law. This would have the inevitable effect of distorting the delicate balance struck by the Act between the rights of labor and management in labor disputes. For these reasons, respondents' misrepresentation claim must be pre-empted.[12]

The Court rejects the argument that the prospect of misrepresentation claims being filed in state court will burden an employer's right to hire permanent replacements for employees engaged in an economic strike. The Court suggests that employers may avoid liability for misrepresentation by conditioning their offers of employment to replacements. In the Court's view, a requirement that employers condition their offers of employment will not have an adverse effect on an employer's ability to hire permanent replacements because under a system in which an employer is not liable for misrepresentation or breach of contract his offers are, as a matter of law, conditional. Honest employers would not make promises that they know they are not obligated to keep and, in any event, replacements would know that the offers were, in some respects, nonpermanent. See *ante,* at 502. Putting aside the validity of these observations, the Court's analysis creates another problem: a requirement that employers condition their offers to replacements might render the replacements nonpermanent under federal law and result in employ-

---

[12] It is also true that the prospect of facing misrepresentation claims would make an employer less likely to enter into an agreement settling a strike for the same reasons that were discussed with respect to the breach-of-contract claim. See *supra,* at 528–533. This would also undermine the policies of the Act and affect adversely its administration. See *supra,* at 532–533, and nn. 4, 5, and 6.

ers being required to reinstate returning strikers regardless of the nature of the strike. The Court acknowledges this problem, and in order to resolve it, changes the law of permanency. See *ante,* at 501–504. The Court states:

> "An employment contract with a replacement promising permanent employment, subject only to settlement with its employees' union and to a Board unfair labor practice order directing reinstatement of strikers, would not in itself render the replacement a temporary employee subject to displacement by a striker over the employer's objection during or at the end of what is proved to be a purely economic strike. The Board suggests that such a conditional offer 'might' render the replacements only temporary hires that the employer would be required to discharge at the conclusion of a purely economic strike. . . . But the permanent-hiring requirement is designed to protect the strikers, who retain their employee status and are entitled to reinstatement unless they have been permanently replaced. . . . [T]he protection is of great moment if the employer is not found guilty of unfair practices, does not settle with the union, or settles without a promise to reinstate. In that eventuality, the employer, although it has prevailed in the strike, may refuse reinstatement only if it has hired replacements on a permanent basis. If it has promised to keep the replacements on in such a situation, discharging them to make way for selected strikers whom it deems more experienced or more efficient would breach its contract with the replacements. Those contracts, it seems to us, create a sufficiently permanent agreement to permit the prevailing employer to abide by its promises." *Ante,* at 503–504 (footnote omitted).

The fact that the Court feels compelled to announce a new standard of "permanency" under federal law highlights the need to pre-empt respondents' misrepresentation claim in

this case.    The Court is in effect adjusting the balance of power struck by the Act between labor and management. The right to strike is so central to the Act that an employer can refuse to reinstate returning economic strikers only if he can show a legitimate and substantial business justification for the refusal.    One such justification is the need to offer permanent employment to replacements in order to continue his business operations.    See *Fleetwood Trailer Co.*, 389 U. S., at 378–379; *supra*, at 526.    If the employer has not had to offer employment to replacements on a permanent basis then there is no justification for refusing to reinstate the strikers.    See *NLRB* v. *Mars Sales & Equipment Co.*, 626 F. 2d, at 572–573; *supra*, at 526–527.    The Court's change in the law of permanency weakens the rights of strikers and undermines the protection afforded those rights by the Act.[13]

---

[13] The Court suggests that the conditional nature of an offer and promise of permanent employment "does not render the hiring any less permanent if the conditions do not come to pass." *Ante*, at 504, n. 8.    The Court goes on to state: "All hirings are to some extent conditional.    As the Board recognizes, . . . although respondents were hired on a permanent basis, they were subject to discharge in the event of a business slowdown." *Ibid.* There is a difference, however, between conditions that turn on the performance of the employee, or on the state of the economy, and conditions that depend on the sole discretion of the employer.    In the latter case, the condition renders the initial promise of "permanence" wholly illusory.

The Court further suggests:

"Had [petitioner] not settled and no unfair practices had been filed, surely it would have been free to retain respondents and obligated to do so by the terms of its promises to them.    The result should be the same if [petitioner] had promised to retain them if it did not settle with the union and if it were not ordered to reinstate strikers." *Ibid.*

If petitioner had not settled in this case and the strike was later adjudicated to have been an economic one, petitioner might have been free to retain respondents and to refuse to reinstate the strikers.    The record suggests that petitioner hired respondents on a permanent basis in order to continue business operations.    See *ante*, at 494–495.    It is difficult to imagine, however, how a conditional offer like the one described by the Court could be construed as an offer of permanent employment.    Under the terms of the Court's conditional offer, the employer is simply saying that he will

Such adjustments in the balance of power between labor and management are for Congress, not this Court.[14]

The real problem in this case, and another factor that supports pre-emption, is that the words "permanent replace-

retain the replacements unless he decides, or is ordered, to reinstate the strikers. As the Court notes, *ante*, at 501, the Board requires an employer to "show that the men [and women] who replaced the strikers were regarded by themselves and the [employer] as having received their jobs on a permanent basis." *Georgia Highway Express, Inc.*, 165 N. L. R. B. 514, 516 (1967), aff'd *sub nom. Truck Drivers and Helpers Local No. 728* v. *NLRB*, 131 U. S. App. D. C. 195, 403 F. 2d 921 (1968). See also *Covington Furniture Mfg. Corp.*, 212 N. L. R. B. 214, 220 (1974), enf'd, 514 F. 2d 995 (CA6 1975) ("While an employer may hire permanent replacements during the course of the strike in order to protect and continue his business, and need not discharge those permanent replacements in order to create vacancies for economic (as distinct from unfair labor practice) strikers who wish to return to work, . . . the employer's hiring offer must include a commitment that the replacement position is permanent and not merely a temporary expedient subject to cancellation if the employer so chooses"). It seems clear that the conditional offer endorsed by the Court could not reasonably be construed to give rise to an understanding that the replacements had received their jobs on a permanent basis. This is why the result should *not* be "the same if [petitioner] had promised to retain [respondents] if it did not settle with the union and if it were not ordered to reinstate strikers." *Ante*, at 504, n. 8.

As the Court of Appeals stated in *Laidlaw Corp.* v. *NLRB*, 414 F. 2d 99 (CA7 1969): "The justification for not discharging replacements in order to reinstate strikers, found in *Mackay* and mentioned in *Fleetwood*, is the need of the employer to assure permanent employment to the replacements so that the necessary labor force can be obtained to maintain operations during a strike." *Id.*, at 105. "If an employer hires replacements without a commitment or understanding that the job is permanent and also discharges the strikers, the interest in protecting economic strikers by an entitlement to reinstatement is not overcome by a substantial business justification. The employer has not had to offer the jobs on a permanent basis as an inducement to continuing his operations." *NLRB* v. *Mars Sales & Equipment Co.*, 626 F. 2d 567, 573 (CA7 1980). See also Brief for NLRB as *Amicus Curiae* 17, n. 10. The Court's rule might help to shield employers from misrepresentation or breach-of-contract claims, see *ante*, at 505–506, n. 9, but it will undermine the right to strike.

[14] As additional support for its conclusion, the Court appears to rely on *J. I. Case Co.* v. *NLRB*, 321 U. S. 332 (1944), for the proposition that "in-

ment" have a special meaning within the context of federal labor law. This is not surprising since the words arise in a context that is at the core of federal labor law: the use of economic weapons to achieve legitimate bargaining objectives. Workers hired to replace striking employees on a permanent basis are nonpermanent to the extent that a strike may be determined to have been an unfair labor practice strike and that an employer may be ordered to reinstate strikers. They are also nonpermanent to the extent that a union may "win" a strike and force an employer to agree to a settlement that requires the reinstatement of striking employees. But such workers are "permanent" under other circumstances. There may be situations in which it is reasonably clear that a strike is an economic one and that an employer has a right to hire permanent replacements and to retain them even when the strike has ended. The employer also may be likely to "win" the strike and to find no need to settle with the union. Under these circumstances, a prudent employer still might find it necessary to condition his offers of employment to replacements in order to avoid even a remote possibility that he will be faced with potential liability for misrepresentation.[15]

---

dividual contracts of employment must give way to otherwise valid provisions of the collective-bargaining contract, . . . but . . . the Board 'has no power to adjudicate the validity or effect of such contracts except as to their effect on matters within its jurisdiction.' " *Ante*, at 506, quoting 321 U. S., at 340. "[T]he discontinuance of . . . individual contracts [is] 'without prejudice to the assertion of any legal rights the employee may have acquired under such contract *or to any defenses thereto by the employer*.' " *Ante*, at 506, quoting 321 U. S., at 342 (emphasis in original). It is important to note that the individual contracts in *J. I. Case Co.* were not tainted by any unfair labor practice, arguable or otherwise. See *id.*, at 333. In any event, the Court in *J. I. Case Co.* did not consider whether suits based on the individual contracts that might be brought by employees in state court would be pre-empted by federal law. See also n. 3, *supra*.

[15] In its *amicus* brief, the Board suggests that under the broad misrepresentation theory involved in this case, see Brief for NLRB as *Amicus Curiae* 15, n. 7, an employer still might be vulnerable to a fraud suit even if he refuses to enter into a settlement agreement and litigates the character

This would burden his right to hire permanent replacements. Moreover, changing the law of permanency to accommodate this development compromises the rights of strikers, which are a crucial part of the federal scheme.

I share the Court's concern over the plight of workers hired to replace striking employees. Contrary to the Court's suggestion, however, strikes are, to some extent, "war." See *ante*, at 500. As Judge Learned Hand stated more than 40 years ago in a case involving the reinstatement of strikers:

> "It is of course true that the consequences are harsh to those who have taken the strikers' places; strikes are always harsh; it might have been better to forbid them in quarrels over union recognition. But with that we have nothing to do; as between those who have used a lawful weapon and those whose protection will limit its use, the second must yield; and indeed, it is probably true today that most men taking jobs so made vacant, realize from the outset how tenuous is their hold." *NLRB* v. *Remington Rand, Inc.*, 94 F. 2d 862, 871 (CA2 1938).

It might be a better world if strike replacements were afforded greater protection. But if accomplishing this end requires an alteration of the balance of power between labor and management or an erosion of the right to strike, this Court should not pursue it.[16] This Court's notions of what would constitute a more "fair" system are irrelevant to determining whether certain state-law claims must be pre-empted because they interfere with the system of labor-management relations established by Congress.

---

of the strike. *Id.*, at 16, n. 9. "If it were ultimately determined that the strike was an unfair labor practice strike and reinstatement of the strikers is required, the replacements could still maintain that the employer fraudulently induced job applicants to accept employment knowing that there was a possibility that reinstatement of the strikers might be ordered." *Ibid.*

[16] The Board suggests that respondents might have an action against the union for breach of its duty of fair representation. *Id.*, at 21, n. 11. There is no need to reach this question in this case.

## IV

Permitting respondents to pursue their breach-of-contract and misrepresentation claims in state court will subject employers to potentially conflicting state and federal regulation of their activities; interfere with the orderly administration of the National Labor Relations Act; and alter the balance of power between labor and management struck by Congress. For these reasons, the claims should be pre-empted, and the judgment of the Kentucky Court of Appeals, therefore, should be reversed.