GIBSON GREETINGS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

International Brotherhood of Firemen
& Oilers, Intervenor.

INTERNATIONAL BROTHERHOOD OF
FIREMEN & OILERS, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Gibson Greetings, Inc., Intervenor.

Nos. 93–1304, 93–1425.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1994.

Decided May 19, 1995.

Paul Grossman argued the cause for petitioner Gibson Greetings, Inc. With him on the briefs were Zachary D. Fasman, Lawrence Peikes, Frank H. Stewart, and Brian P. Gillan.

Paul L. Styles, Jr., argued the cause and filed the briefs for petitioner Intern. Broth. of Firemen & Oilers.

William M. Bernstein, Atty., N.L.R.B., argued the cause for respondent. With him on the brief were Frederick L. Feinstein, Gen. Counsel, Linda R. Sher, Acting Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B. Margaret G. Bezou and Peter D. Winkler entered appearances.

Before WALD, WILLIAMS, and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

This case arises from a strike called by the International Brotherhood of Firemen & Oilers, AFL–CIO at Gibson Greetings, Inc.'s Berea, Kentucky plant in the summer of 1989. The Company petitions for review of an NLRB decision ordering it to reinstate with backpay all strikers who unconditionally offered to return to work by August 8, 1989, and ten strikers whom it discharged on misconduct grounds. The Union challenges the Board's decision insofar as it: (1) fails to award the Union recovery of the legal fees it incurred in defending a lawsuit that the Company brought against it in federal court to challenge the legality of the strike; (2) refuses to give *res judicata* effect to the earlier lawsuit; and (3) fails to hold that the strike was converted from an economic strike to an unfair labor practice strike on the first day.

We do not find in the record substantial evidence to support the findings upon which the Board based its order requiring the Company to reinstate all strikers who unconditionally offered to return to work. We therefore reverse (in Parts II A & B) that portion of the Board's order, and hold that all strikers who were permanently replaced before unconditionally offering to return to work are entitled only to be placed on a preferential hiring list for the purpose of reinstatement as positions become available. We do find substantial evidence in the record to support the Board's determination that the Company unlawfully discriminated in discharging ten strikers on misconduct grounds. Accordingly, (in Part II C) we deny the Company's petition insofar as it asks this court to reverse the Board's decision as it applies to four of the ten strikers. Finally, we deny the Union's petition for review in its entirety for the various reasons set out (in Part II D) below.

## I. BACKGROUND

The Company entered into a collective bargaining agreement (CBA) with the employees at its Berea plant in 1986. As the April 30, 1989 expiration date of the CBA drew near, the Company and the Union began negotiating a new agreement. No new agreement having been reached by April 30, the Union voted to strike as of May 1. On April 29, the Company advertised in a local newspaper that it was seeking "400 applications because of a possible labor dispute," and on May 1 it began hiring replacement

workers. On that day the Company also sent the striking employees a letter that included the following statement:

> We will begin to hire and train new employees immediately so you should understand that you have a right to work here which is protected by federal and state law *if you return to work before you are replaced.* It really is up to you. [Emphasis in original]

On May 15, Company and Union representatives met for the first time since the beginning of the strike. At that meeting, which was scheduled by a federal mediator who was also present, the Company took the position that the strike was illegal because it violated the 1986 CBA. Section 6 of that CBA prohibited strikes during the life of the agreement, and Section 13 stated that the CBA would remain in effect if negotiations for a successor agreement continued beyond its expiration date. The Company argued that negotiations had indeed continued beyond the expiration date, so that the CBA, including the strike prohibition, remained in effect. The Union disputed the Company's premise, maintaining that negotiations did not continue past April 30, wherefore the CBA had expired by its terms on that date. In order to resolve this dispute, the Company's representative asked the mediator to contact another mediator who had been acting as a conduit between the two parties immediately prior to the strike. Unable to contact his predecessor just then, the current mediator met separately with each side and then adjourned the meeting.

The next meeting occurred on May 21. At that meeting, the Company presented the Union with a letter (dated May 18) stating that it would be willing to continue negotiations if the Union either ended the strike or provided the Company with "written confirmation that any negotiations would not be considered a waiver of the Company's contractual position" that the strike was illegal. The Union promptly provided the requested confirmation, and the parties negotiated over a strike settlement agreement—covering the seniority of returning strikers, their assurance against reprisals, *etc.*—proposed by the Union. The parties met again on May 30 and on four more occasions in June and July to negotiate the terms of the CBA itself.

Despite these efforts, the parties did not agree upon a new CBA. On August 8, the Union made an unconditional offer on behalf of all striking employees to return to work. The Company reinstated some of the strikers, but it denied immediate reinstatement to 177 of them on the ground that they had been permanently replaced by new employees hired during the strike. The Company also discharged ten strikers for misconduct during the strike. Both the Union and several former strikers filed unfair labor practice charges and the General Counsel issued a complaint alleging that the Company had violated §§ 8(a)(1), (3), and (5) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1), (3), (5).

After conducting a hearing, an Administrative Law Judge held that the Company had, among other things prohibited by the Act, unlawfully refused to bargain on May 15, 310 N.L.R.B. 1286, 1314–15, 1993 WL 151871 (1993), which converted the strike from an economic strike to an unfair labor practice strike as of that date. The ALJ further determined that the replacements hired by the Company were permanent employees; accordingly he ordered the Company to reinstate immediately all striking employees insofar as positions were then available, and required the Company to dismiss only replacement workers hired on or after May 15 in order to make positions available. The ALJ ordered the Company to reinstate as jobs become available those strikers whom it had replaced prior to May 15. The ALJ also held that the ten strikers discharged for misconduct had been discriminatorily discharged, and ordered the Company to reinstate them immediately.

The NLRB affirmed the ALJ's decision in all but one important respect: the Board found that the replacement employees were only temporary, not permanent, hires. Consequently, the Board ordered the Company to reinstate immediately, and pay lost wages to, all the strikers who had unconditionally applied for reinstatement, *i.e.*, regardless whether they were replaced before or after

May 15. 310 N.L.R.B. 1286, 1993 WL
151871 (1993).

## II. ANALYSIS

■■■ An economic striker who offers un-
conditionally to return to work is entitled to
immediate reinstatement unless his employer
can show a "legitimate and substantial busi-
ness justification[ ]" for refusing to reinstate
him. *NLRB v. Fleetwood Trailer Co.*, 389
U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d
614 (1967). That he was replaced by a per-
manent employee during the strike is such a
justification, *id.* at 379, 88 S.Ct. at 546; an
economic striker who is permanently re-
placed thus loses his right to immediate rein-
statement. *NLRB v. International Van
Lines*, 409 U.S. 48, 50, 93 S.Ct. 74, 76, 34
L.Ed.2d 201 (1972); *General Indus. Employ-
ees Union, Local 42 v. NLRB*, 951 F.2d 1308,
1311 (D.C.Cir.1991). In contrast, an unfair
labor practice striker who unconditionally of-
fers to return to work is entitled to reinstate-
ment regardless of whether he has been re-
placed by a permanent hire. *International
Van Lines*, 409 U.S. at 50–51, 93 S.Ct. at 76–
77; *General Indus. Employees Union, Local
42*, 951 F.2d at 1311.

In this case, the key questions are whether
the Company permanently replaced the
strikers and, if so, whether they were en-
gaged in an unfair labor practice strike or an
economic strike when they were replaced.
The NLRB erred in deciding both of these
questions.

### A. *Were the new hires permanent employ-ees?*

■■■ An employer meets its burden of
proving that it permanently replaced its
striking employees by "show[ing] it had a
mutual understanding with the replacements
that they were permanent." *NLRB v. Au-
gusta Bakery Corp.*, 957 F.2d 1467, 1473 (7th
Cir.1992). We will uphold the Board's find-
ing of permanence *vel non* if it is supported
merely by substantial evidence in the record
considered as a whole, but not otherwise.
*NLRB v. Mars Sales & Equip. Co.*, 626 F.2d
567, 573 (7th Cir.1980); *see also Universal
Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71
S.Ct. 456, 466, 95 L.Ed. 456 (1951).

■■■ In this case, rather than simply find-
ing that the replacements were temporary,
the Board found that the Company failed to
meet its burden of proving their permanence.
This raises the nice question whether we
should reverse the Board only if we deter-
mine that there is no substantial evidence
that the Company failed to meet its burden
of proof concerning permanence or even if
we determine merely that there is no sub-
stantial evidence that the employees were
temporary, i.e., without regard to evidentiary
burdens. In light of the compelling evidence
in favor of permanence in this case, however,
we need not resolve this question; under
either approach, the Board's determination is
not supported by substantial evidence.

There are five pieces of evidence in the
present record that potentially bear upon the
question of permanence: (1) a statement
read to each replacement employee at the
time he or she was hired; (2) a June 29
memorandum from the Company to its re-
placement employees; (3) the testimony of
Ms. Wilma Chenault, a replacement worker;
(4) the testimony of Mr. Gerald Tudor, a
human resources manager at the Company;
and (5) an April 29 newspaper advertisement
for openings at the Company's Berea plant.
The Board considered the first four in reach-
ing its conclusion.

A Company representative read the follow-
ing statement to each employee at the time
he or she was hired:

> You are being hired as full time associates,
> but understand this—Due to the seasonal
> nature of our business, it must be under-
> stood that as a new Associate your employ-
> ment may be subject to lay-offs. Each
> time that you are recalled for work we will
> only estimate the duration of time work is
> expected to last as we can never be cer-
> tain.

> Each Associate currently on strike has the
> opportunity to return to work to an avail-
> able job. Once they do this, their length of
> service and qualifications will be recog-
> nized for new openings and during reduc-
> tions in the work force. Another possibili-
> ty could be that if the Co. and the Union
> should renegotiate an agreement that al-

lowed Union associates to return to work, the possibility exists that new associates may be layed [sic] off depending on the Company's manning requirements.·

The Board found that this statement is equivocal with regard to whether the replacements are permanent hires, and we accept that assessment as a reasonable one. Although the statement indicates that the new "associates" could be laid-off in the event of a business slowdown or of a settlement with the Union, such conditions do not render an offer of employment non-permanent. *Belknap, Inc. v. Hale,* 463 U.S. 491, 503–04 & n. 8, 103 S.Ct. 3172, 3179 & n. 8, 77 L.Ed.2d 798 (1983) ("That the offer and promise of permanent employment are conditional does not render the hiring any less permanent if the conditions do not come to pass. All hirings are to some extent conditional.") Hence, the statement does not clearly establish that the new hires are temporary. The Company points out that the new employees were being hired as "full time associates" but that suggests only that they were not being hired as part-time employees; it does not speak to the question of their permanence. The statement that each employee then on strike had the opportunity to return to "an available job" is also ambiguous. The quoted phrase might apply to the position being filled by the replacement or only to a position that has not yet been filled by a replacement when the striking employee offers to return— which is why both the Company and the Board invoke the hiring statement as support for their respective positions on permanence. Because the hiring statement provides no evidence in either direction, however, the Board had to look elsewhere, as do we, in order to determine whether the replacements were permanent or temporary hires.

In the June 29 memorandum, the Company advised its employees as follows:

(1) "The Company has refused the Union's demands to replace all of ·the employees who crossed the picket line with strikers"; (2) "*Every additional replacement hired means one less job for the strikers* at the conclusion of the strike"; and (3) "[T]he Company has no intention to modify its position on ... not discharging or requir-

ing Union membership of those who have been through so much to do the work." (emphasis in original)

The Board dismissed the June 29 memorandum in a footnote because it "does not clearly state" that the Company considered the replacements permanent, and it was not circulated until after replacements had been hired. 310 N.L.R.B. at 1290 n. 19. The latter point is irrelevant because the Board has in the past consistently relied upon such post-hiring statements as evidence of the replacement employees' permanence, *see, e.g., Associated Grocers,* 253 N.L.R.B. 31, 1980 WL 12561 (1980), *enforced sub. nom. Transport and Local Delivery Drivers Local 104 v. NLRB,* 672 F.2d 897 (D.C.Cir.1981) (relying solely upon post-hiring statement to change the status of replacement workers who, upon hiring, were told that they were temporary); *J.M.A. Holdings, Inc.,* 310 N.L.R.B. 1349, 1993 WL 157817 (1993) (pointing both to hiring statement and to post-hiring statement as evidence that new hires were permanent replacements), and the Board has failed to give a "reasoned justification" for its apparent departure from the path it has worn. *Pittsburgh Press Co. v. NLRB,* 977 F.2d 652, 655 (D.C.Cir.1992).

Worse, however, the Board's other reason for giving the June 29 memorandum short shrift—that it did not clearly state that the replacements were permanent—is unfounded in fact. The NLRB itself has not required an employer to have used "the magic word 'permanent'" in order to establish that it indeed hired replacements as permanent employees. *See Crown Beer Distributors, Inc.,* 296 N.L.R.B. 541, 549, 1989 WL 224309 (1989). More important, the memorandum makes it abundantly clear that the replacement employees would not be replaced by returning strikers. Indeed, any replacement worker reading the memorandum could not have helped but to conclude that he or she was now a permanent employee. For the purpose of determining whether a striking employee is entitled to reinstatement, the promises made in the June 29 memorandum clearly establish the required "mutual understanding" that the replacement workers were hired "permanently." *See Augusta Bakery Corp.,* 957 F.2d at 1473. Consequently, un-

less the other evidence in the record undermines or countermands the Company's promise of permanence in the June 29 memorandum, the Board's conclusion that the Company failed to meet its burden of proof on this point is not supported by substantial evidence, at least with regard to any employee to whom the Company made the promises contained in the June 29 memorandum.

The only other evidence cited by the Board is the testimony of Mr. Tudor and Ms. Chenault. Mr. Tudor testified that some interviewees asked him what would happen if the strike ended, and that he told those who asked that "there was a possibility . . . that new hires could be placed on lay-off subject to [the Company's] manning requirements at the time." According to Mr. Tudor, he made this statement only to applicants who specifically asked him what would happen if the strikers returned, and there is no evidence in the record to indicate how many interviewees asked him this question. Nor is there any evidence in the record to suggest that Mr. Tudor made this statement to any employee hired after the circulation of the June 29 memorandum. Mr. Tudor's testimony thus does not undermine the promissory effect of the June 29 memorandum.

Ms. Chenault was questioned at the hearing about what Mr. Tudor told her during her hiring interview and what she understood him to mean; she was the only replacement employee so questioned. She testified: "We was told, you know—we didn't know how long we was going to be there when we was a replacement. You know, just—till this was all over." In other words, Ms. Chenault understood Mr. Tudor to say that she was not being offered a permanent position. Ms. Chenault, however, was interviewed on May 3, well before the June 29 memorandum was circulated. Even if we were to assume for the moment that her testimony could establish that all of the replacements hired through May 3 were hired as temporary employees, therefore, it still would have no bearing upon the question whether the replacements were made permanent as of June 29.

The Board seems to recognize that the testimony of Mr. Tudor and Ms. Chenault is of marginal significance, stating only that "[t]his is far from an unequivocal assurance that their employment was permanent." Fair enough, but the June 29 memorandum was such an unequivocal assurance, and the Board erred in discounting it. Moreover, the Board failed to consider further evidence supporting the Company's position: On April 29 the Company ran a newspaper advertisement stating that it was seeking applications for "[o]penings for regular employees" and informed potential applicants that the company benefits include "medical insurance," "paid vacations," "holidays," and "pensions." The clear implication, particularly of the benefits, is that the jobs were being offered not for temporary but for permanent employment, and applicants who responded to this newspaper advertisement would surely have so understood.

In sum, although we can overlook the Board's failure to give weight to the April 29 newspaper advertisement because its probativeness is at least debatable and it would be extremely difficult to ascertain which replacements saw it, we cannot do the same with regard to the June 29 memorandum; all employees to whom the company made the promises contained in that document became, without doubt, permanent hires. Accordingly, we reverse the Board's determination finding to the contrary for want of substantial evidence on the record considered as a whole.

**B.** *Was the strike converted to an "unfair labor practice" strike?*

 The proper characterization of a strike depends upon its cause: "a work stoppage is an unfair labor practice strike only if the employer's violations of the labor laws are a 'contributing cause' of the strike." *General Indus. Employees Union, Local 42,* 951 F.2d at 1311; *accord Teamsters Local Union No. 515 v. NLRB,* 906 F.2d 719, 723 (D.C.Cir.1990). For a strike that starts out as an economic dispute to be "converted" into an unfair labor practice strike, "it must appear that the [unfair labor] practice prolonged the strike." *Allied Indus. Workers, AFL–CIO Local Union No. 289 v. NLRB,* 476 F.2d 868, 883 (D.C.Cir.1973). Absent

evidence of such prolongation, an employer's unfair labor practice does not "ipso facto convert [an economic strike] into an unfair labor practice strike." *C–Line Express*, 292 N.L.R.B. 638, 1989 WL 223807 (1989); *see also Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1079–80 (1st Cir.1981). The General Counsel has the burden of proving that the employer's unfair labor practice prolonged the strike, and we review for substantial evidence the Board's determination that the strike was indeed prolonged thereby. *Soule Glass and Glazing Co.*, 652 F.2d at 1080.

In this case, the Board concluded (1) that the Company committed an unfair labor practice at the meeting convened by the mediator on May 15, and (2) that the strike was prolonged as a result. 310 N.L.R.B. at 1288–89. These determinations, if correct, would mean that any striking employee who had not by then been permanently replaced would be entitled to reinstatement. *International Van Lines*, 409 U.S. at 50–51, 93 S.Ct. at 76–77; *General Indus. Employees Union, Local 42*, 951 F.2d at 1311. In fact, however, neither determination is supported by the record.

At the May 15 meeting, the Company informed the Union that it believed the CBA was still in effect and that the strike was therefore unlawful. The ALJ concluded that the Company's contractual position was "patently false," and therefore that its "demands were made in bad faith," in violation of § 8(a)(5). The ALJ further held that the Company's "insistence on the bad-faith demands interrupted bargaining from May 15 through May 30." 310 N.L.R.B. at 1311. The Board affirmed these findings after further clarifying that the ALJ

found that at the May 15 meeting [the Company] made it clear that it would not bargain over the terms of the [CBA] until the Union acceded to either ... [the] demand[ ] that what [the Company] contended was an illegal strike be called off or the Union sign what amounted to a written waiver of any right to characterize [the Company's] continued participation in the

negotiations as an abandonment of its illegal strike contention.
*Id.* at 1288.

Both the ALJ and the Board were hopelessly confused about the chronology of events reflected in the record. The Company did not demand at the May 15 meeting that the Union end the strike, nor did it make any statement that could be construed as a demand that the Union agree not to characterize the Company's participation in negotiations as an abandonment of its argument that the strike was unlawful. The record indicates that these "demands" were not made until the May 21 meeting. Hence, the Board's determination that the employer violated § 8(a)(5) on May 15 rests upon a factual finding that is not supported by any, let alone substantial, evidence.

Although the Board did not directly address the issue, the Company's demands at the May 21 meeting may have constituted at least a technical violation of § 8(a)(5). *See Teamsters Local Union No. 515*, 906 F.2d at 723 n. 3 ("Insistence upon matters not within the scope of mandatory bargaining as a condition to any agreement constitutes a refusal to bargain in good faith, in violation of section 8(a)(5)"). If that was a violation, however, it did not prolong the strike because the Union promptly provided the assurance that the Company sought and the parties immediately proceeded to negotiate about the Union's proposed strike settlement agreement.

■ In its opinion the Board correctly notes that the parties did not negotiate about the terms of a new CBA until May 30, but the Board incorrectly infers that the Company's May 21 demands interrupted all substantive negotiations until then. Implicit in the Board's conclusion is the assumption that negotiation over the terms of a strike settlement agreement does not count as substantive bargaining. On the contrary, "strike settlement agreements involve mandatory subjects of bargaining," *Teamsters Cannery Local 670 v. NLRB*, 856 F.2d 1250, 1259 (9th Cir.1988), and negotiating about a strike settlement agreement therefore counts as substantive bargaining. Because the Union and the Company were negotiating about a mandatory subject of bargaining on May 21, the

Board's finding that negotiations were stalled until May 30 is not supported by substantial evidence.

The Board also states in passing in its opinion that the Company's May 21 demands "tainted the bargaining climate and impeded opportunities for settlement of the strike." 310 N.L.R.B. at 1288. Although this factual assertion, if true, again might support a conclusion that the employer committed an unfair labor practice that prolonged the strike, the Board points to no evidence in the record to support its assertion, and our review of the record indicates that there is no such evidence.

■ The Board's determination that the strike began as an economic strike is not challenged. As can readily be seen from an accurate account of the facts of record, the Company's May 21 demands did not prolong the strike and therefore did not convert it into an unfair labor practice strike. We conclude, therefore, that the work stoppage was an economic strike from start to finish. Hence, any strikers that were permanently replaced at any time before they unconditionally offered to return to work are entitled only to be placed upon a preferential hiring list for the purpose of reinstatement as positions become available. *See Laidlaw Corp.,* 171 N.L.R.B. 1366 (1968), *enf'd,* 414 F.2d 99 (7th Cir.1969).

### C. *Did the Company improperly discharge employees for strike misconduct?*

In addition to denying reinstatement to the 177 striking employees who had been permanently replaced, the Company discharged ten strikers for misconduct during the strike. The Board held that all ten discharges were discriminatory, in violation of §§ 8(a)(1) and (3) of the NLRA. The Company now challenges the Board's decision as it relates to four of the discharges.

■ A discharge is discriminatory in violation of the Act if "an antiunion animus contributed to the employer's decision to discharge [the] employee." *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983). The Board may rely entirely upon circum-

stantial evidence, if it is substantial, to determine that a discharge was unlawful. *Avecor, Inc. v. NLRB,* 931 F.2d 924, 928 (D.C.Cir. 1991). In this case, the Board relied upon the ALJ's finding that the Company failed to discipline nonstrikers for misconduct during the strike that was equivalent to or more serious than the misconduct of the four striking employees whom it discharged. 310 N.L.R.B. at 1291.

■ The Company does not dispute the ALJ's finding; nor does the Company make any effort to explain why it treated the striking and nonstriking employees differently. Instead, the Company argues that the Board cannot compare the severity of the various employees' misconduct because the types of misdeeds committed by the striking and nonstriking employees are not the same. According to the Company, the Board can make such comparisons without invading the province of the employer only if the striking and nonstriking employees actually committed the "same offense." This limitation, however, is contrary to established Board precedent, and without support in the decision of any reviewing court. *See, e.g., International Paper Co.,* 309 N.L.R.B. 31, 39, 1992 WL 281692 (1992) (finding § 8(a)(3) violation on ground that nonstrikers' misdeeds, although different from those of discharged strikers, were of equal or greater seriousness), *enf'd sub. nom. Local 14, United Paperworkers Int'l Union v. NLRB,* 4 F.3d 982 (1st Cir. 1993); *Champ Corp.,* 291 N.L.R.B. 803, 806– 07, 1988 WL 214239 (1988) (accord), *enf'd on other grounds,* 933 F.2d 688, 700 (9th Cir. 1990); *Aztec Bus Lines,* 289 N.L.R.B. 1021, 1027, 1988 WL 214305 (1988) (accord). We think the Board may make reasonable judgments about the seriousness of various offenses—or more properly about an employer's explanation for treating some offenses more harshly than others—without intruding upon management's right to manage. The task is analytically indistinguishable from what is required in any case involving an allegedly pretextual discharge.

Moreover, the Company's approach could have untoward results. For example, assume that three employees of Company X engage in misconduct during a strike; strik-

ing employees A and B are discharged for their misconduct, but nonstriking employee C is not. Further, assume that A and C commit the "same offense," which is (by any reasonable measure) far more serious than the offense committed by striking employee B. Under the Company's proposed "same offense" rule, striker A, the more serious wrongdoer of the two striking employees, could base a discrimination claim upon the Company's failure to discharge nonstriker C, while striker B (the less serious wrongdoer) could have no such claim. That outcome seems questionable, to say the least.

 We reject the Company's proposed test because it is contrary to precedent and likely to yield perverse outcomes. Concomitantly, we uphold the Board's determination that the four disputed discharges were in violation of §§ 8(a)(1) and (3) of the Act, and we enforce the Board's order in this respect.

### D. *The Union's claims*

In its separate petition for review the Union makes three claims, none of which is meritorious. Two of the Union's claims relate to the lawsuit that the Company filed in federal district court during the strike. In that suit the Company maintained that the strike was in violation of the CBA, for which it sought damages under § 301 of the Labor Management Relations Act. 29 U.S.C. § 185. The district court granted summary judgment in favor of the Union. *Gibson Greetings, Inc. v. International Bhd. of Firemen & Oilers,* No. 90–24, 1990 WL 471856 (E.D.Ky. Sept. 28, 1990), *aff'd,* 947 F.2d 944 (6th Cir.1991). The court found that the Company and the Union had not continued to negotiate after the expiration of the CBA, which was therefore effectively terminated on April 30, 1989. Having concluded that the strike was not in violation of the CBA, however, the district court went on to state that "there has been no evidence presented of any bad faith in bargaining on behalf of Gibson and [the court] specifically makes no findings on this issue." *Id.* at *4.

First, the Union argues that the Board should have "given *res judicata* effect" to the findings of the district court in the § 301 case; the Board responds in kind that it

"adheres to the general rule that if the Government was not a party to the prior private litigation, it is not barred from resolving an issue involving enforcement of Federal law that a private party has litigated unsuccessfully." This is all very curious, for assuming *arguendo* that the doctrine of *res judicata* applies in such a context, we simply do not see how it could in any way affect the outcome of the Board's proceedings in this case. In all relevant respects, the Board came to the same conclusions as the district court, *viz.* that negotiations were not on-going as of April 30, and that therefore the strike was not in breach of the CBA. 310 N.L.R.B. at 1288. Nothing in our decision reversing the Board's determination that the strike later became an unfair labor practice strike casts any doubt upon those two findings of the Board. Inasmuch as the district court made no finding about whether the Company's claims were made in bad faith, it does not appear that affording its decision *res judicata* effect would be of any moment, either to the Board's decision or to our review thereof. Consequently, we do not reach the Union's claim that the Board should have applied the doctrine of *res judicata* here.

 Second, the Union argues that the Board erred in failing to award it the costs and fees it incurred in defending against the Company's § 301 suit. The NLRB can award a Union the costs and fees it incurs in defending against an employer's baseless, retaliatory lawsuit only if it determines that the filing or maintenance of the lawsuit was an unfair labor practice. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 744–49, 103 S.Ct. 2161, 2170–73, 76 L.Ed.2d 277 (1983). There is no indication in the present record, however, that the Union ever charged, or that the General Counsel ever filed a complaint alleging, that the lawsuit amounted to an unfair labor practice; hence, the issue was not litigated before the ALJ, at least not in the proceeding under review. Accordingly, we reject the Union's claim that it is entitled to its costs and fees for defending against the Company's § 301 suit.

Finally, the Union contends that the strike converted to an unfair labor practice strike

on May 1, for two reasons: (1) the Company decided on that date that it would not bargain with the Union; and (2) on that date the Company began to implement its decision, *e.g.* by hiring replacement workers and by sending a letter to the striking employees, both of which steps prolonged the strike.

The only evidence cited by the Union in support of its first contention is a passage in the ALJ's decision citing, without comment, the testimony of the Company's negotiator to the effect that he raised the lawfulness of the strike on May 15 in the hope of bringing about a settlement. This evidence is irrelevant to the question whether the Company would have negotiated between May 1 and May 15. Thus, the Union provides us with no evidence that the Company committed an unfair labor practice by refusing to negotiate as early as May 1.

Concerning the Union's other contention, we note first that while the Board determined that the May 1 letter violated § 8(a)(1), it affirmed the ALJ's conclusion that the letter did not prolong the strike. The only support that the Union cites for its claim to the contrary is the testimony of several striking employees that the May 1 letter made them concerned that they might lose their jobs. None of them testified that the May 1 letter had any effect upon his decision either to strike in the first place of to stay out on strike. Because this evidence has no bearing upon the dispositive question whether the Company did anything unlawful to prolong the strike, we affirm the Board's determination that the strike was not converted to an unfair labor practice strike on May 1, 1989.

## III. Conclusion

For the foregoing reasons, we reverse the Board's determinations concerning (1) the conversion of the strike from an economic to an unfair labor practice strike and (2) the status of the replacement workers; therefore the striking employees who were permanently replaced before they offered unconditionally to return to work are entitled only to be placed on a preferential hiring list for the purpose of reinstatement as positions become available. Because we cannot determine from the record whether the Company made the promises contained in the June 29 memorandum to those replacement employees, if any, whom it hired after June 29, we remand that question to the Board with the instruction that any replacement hire to whom the Company made such promises shall be considered permanent as of that time. We affirm the Board's determination that four employees were unlawfully discharged for alleged strike misconduct, and enforce the Board's order as it applies to them. Finally, we deny the Union's petition for review in its entirety.

*So Ordered.*